DAVENPORT v. PRENTICE et al.

(Supreme Court, Appellate Division, Second Department.   May 8, 1908.)

1. TRIAL—INSTRUCTIONS—EXCEPTIONS—SUFFICIENCY.
　　An exception to an instruction which points out the language complained of by repeating the identical words is sufficient without stating the reason why the charge is considered erroneous.
　　[Ed. Note.—For cases in point, see Cent. Dig. vol. 46, Trial, § 690.]

2. BANKS AND BANKING—VERIFICATION OF REPORTS BY PRESIDENT.
　　Banking Law, Laws 1892, p. 1853, c. 689, § 20, as amended by Laws 1898, p. 958, c. 333, relating to the verification of official reports of banks to the superintendent of banking, does not require that the reports be verified by an unqualified oath of the president and cashier or treasurer, but only by an oath that they are true and correct "to the best of his knowledge and belief."
　　[Ed. Note.—For cases in point, see Cent. Dig. vol. 6, Banks and Banking, § 20.]

3. APPEAL AND ERROR—REVIEW—HARMLESS ERROR—BURDEN OF SHOWING PREJUDICE.
　　If it be possible that the unsuccessful party was prejudiced by an erroneous instruction, the verdict must be set aside; and the burden is upon the successful parties, if they wish to sustain the verdict, to show that the error did not and could not have affected it.
　　[Ed. Note.—For cases in point, see Cent. Dig. vol. 3, Appeal and Error, §§ 4047–4051.]

4. SAME.
　　In an action against a bank president for negligence in verifying a false report to the superintendent of banking, the court charged that it was the duty of the president to have such knowledge of the contents of the reports that he could truthfully make oath that the reports were true in all respects, while Banking Law, Laws 1892, p. 1853, c. 689, § 20, as

amended by Laws 1898, p. 958, c. 333, provides that such a report shall be verified by oath of the president, etc., to the effect that it is true and correct in all respects "to the best of his knowledge and belief." *Held*, that the charge constituted prejudicial error, where it did not appear that the jury had ever heard read or read the statute, and where they might not have found proof of defendant's negligence in verifying the report, had they known that he might verify it on oath limited to the best of his knowledge and belief.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 3, Appeal and Error, §§ 4219–4228.]

5. WORDS AND PHRASES—"KNOWLEDGE."

"Knowledge" may mean that gained by information or intelligence, and is not confined to what is personally observed.

[Ed. Note.—For other definitions, see Words and Phrases, vol. 5, pp. 3940, 3942.]

6. BANKS AND BANKING—OFFICERS—"KNOWLEDGE" OF TRUTH OF REPORTS. VERIFIED.

In determining whether a bank president was negligent in making oath that a report to the superintendent of banking was true to the best of his knowledge and belief, the word "knowledge" must be taken in its common, ordinary meaning.

7. SAME—LIABILITY OF PRESIDENT FOR HONESTY OF CASHIER.

A bank president is not an insurer of the honesty of the cashier.

8. SAME—DUTY OF PRESIDENT.

The duty of a bank president is to preside, and his other duties may vary according to usage or by-law of the institution, and, while he is usually expected to exercise a more constant, immediate, and personal supervision than an ordinary director, the mere fact that he permits the cashier to have physical control of securities is not necessarily proof of his negligence.

9. SAME—OFFICE OF CASHIER.

The cashier of a bank is presumed to be the principal executive officer, and by virtue of his office is generally intrusted with the bank's securities.

10. SAME—VERIFICATION OF REPORTS BY PRESIDENT—NEGLIGENCE—QUESTION FOR JURY.

In an action against a bank president for negligence in verifying a false report to the superintendent of banking, whether he was negligent in failing to see for himself the securities listed therein at the time he made the verification of the report *held* to be a question for the jury.

11. SAME—PRESIDENT A TRUSTEE.

A bank president is to be regarded as a trustee bound to exercise such care and prudence in his office as men of common prudence ordinarily show in their own affairs; the measure of his care being dependent on the subject to which it is due and the circumstances of each particular case.

Gaynor, J., dissenting.

Appeal from Trial Term, Richmond County.

Action by John S. Davenport, as receiver of the Bank of ·Staten Island, against Augustus B. Prentice and others. Defendant Prentice died pending the action, and Annie C. B. ·Foster, his administratrix, appealed from an adverse judgment. Reversed, and new trial granted.

Argued before JENKS, HOOKER, RICH, MILLER, and GAYNOR, JJ.

110 N.Y.S.—67

John G. Milburn (Walter F. Taylor and Frederick P. Forster, on the brief), for appellant.

Charles F. Brown (Nathan D. Stern, on the brief), for respondent.

JENKS, J. I think that this judgment must be reversed for an error in instructions to the jury. The appeal is by the administratrix c. t. a. of Augustus Prentice from a judgment entered on a verdict at Trial Term against the estate for $183,690. The plaintiff, as the receiver of the Bank of Staten Island, sues the officers and directors of the bank in a common-law action for negligence, whereby Ahlmann, the cashier and a director, found opportunity for thefts which brought the bank to insolvency and the closing of its doors on December 31, 1903. Ahlmann killed himself on December 30, 1903. Twenty-two thousand five hundred and thirty dollars was recovered from his estate. Augustus Prentice was the president, and he, with A. B. Prentice, R. L'H. Finch, Wood, and Ahlmann, were directors. Finch is dead. Wood was not served, but was called as a witness by the plaintiff, and as to A. B. Prentice the action was dismissed at trial.

The plaintiff read in evidence official reports of the bank to the superintendent of banking, of which all, save the last, were verified by Prentice as president and by Ahlmann as cashier. The last was verified by Ahlmann alone, with the statement that Prentice was ill. The examination by the state bank examiner showed that the report of December, 1902, was correct and, that the assets were intact. There is no doubt, however, that a report was verified by Prentice after securities to a large amount or their proceeds had been made away with by Ahlmann, which report showed that the securities or their equivalent were still assets of the bank; and the contention of the plaintiff is that the fact that Prentice as president verified a report or reports which were false in that respect was evidence of negligence in his offices as president and as a director. There were also other acts of alleged omission proved as to the conduct of the bank by him and his fellow officers, such as lack of attention, audit or examination, absence of proper committees of supervision, and of directors' meetings, improper bookkeeping, lax care of securities, and other matters of alleged slipshod management. If at the time of a verification of a particular report which showed the securities or their equivalent on hand the securities had been stolen, the fact that the verification was made in such ignorance was not the cause of the theft. The cashier did not know but that before the president joined in the verification thereof he might call for a production of the securities. The cashier could only surmise when he abstracted the securities that, as to future reports, the president might not require the production of the securities, and, if the president had not done so in the past, he probably would be content not to do so in the future. But much stress was laid upon the verification of these reports upon the proposition that, if Prentice had observed due care in qualifying himself to make the oath, he would not have been ignorant of the fact that the securities were no longer possessed by the bank. Indeed, the learned court, after instructing

the jury that negligence must be proven against Prentice, said that
the jury must determine whether reasonable care was exercised to
prevent dishonesty, and whether the losses were traceable to specific
acts of negligence on the part of Prentice, and thereupon called to
the attention of the jury that Prentice had signed quarterly reports;
that the last of them was signed in August, 1903; that at that time,
as it recalled the evidence, the bonds had been extracted and the
fraudulent loans of $30,000 had been made. Then the court laid
down the law as to the requirement of the oath by Prentice, in terms
which I shall specifically notice further on, and immediately charged
the jury:

"I also charge you that inasmuch as the said reports contained statements
that the bank was owner of certain investment securities at the time of mak-
ing such reports, if the jury, you find that the president of the bank made
such reports without knowledge that such investments were in the posses-
sion of the bank, and relied upon the statement of the cashier, instead of
informing himself of the fact, and that as a consequence thereof opportunity
was given to the cashier to make away with such securities so as the same
were lost to the bank, then you may find a verdict for the plaintiff for such
amount as you find was lost as the result of such conduct or negligence on
the part of the president of the bank."

And the court thereafter further charged:

"I charge you, further, it is the duty of the president of a bank to keep
himself informed, sufficiently familiar with the affairs of the bank, and the
conduct thereof—not alone by the cashier, but the general conduct, and the
investment of securities, and the securities on hand—to enable him truth-
fully and faithfully to comply with the requirements of the statute that he
verify on oath the several quarterly reports as to the details thereof."

The stolen securities represented a very great part of the thefts.
I now consider the instructions of the court as to the oath annexed
to the report, which were as follows:

"Now, the banking laws of the state of New York in the year 1900 and
subsequent thereto made it the duty of the president of the bank to verify
by oath the several quarterly reports to the superintendent of banks which
have been put in evidence in this cause, and to verify by his oath as to each
of said reports that the same was true and correct in all respects. I charge
you as matter of law that it was the duty of the president of the bank to
have such knowledge of and such acquaintance with the several matters stated
in the quarterly reports that he could truthfully make oath that the said
reports were true in all respects."

The exception taken to this instruction was as follows:

"Defendants' counsel excepts to so much of the charge as instructs the
jury that it was the duty of the president of the bank to have such knowledge
of and such acquaintance with the several matters stated in the quarterly
reports that he could truthfully make oath that the said reports were true
in all respects."

The first question is whether the exception was sufficient. The
purpose of such an exception is to call the attention of the court to
the instruction given and to the fact that it is objected to, in order
that the court may have the opportunity to retract, alter, or modify
the instruction. Comparing the exception with the instruction, it
appears that the exception pointed out the precise language of the in-
struction objected to. The court could not mistake the subject of the

exception.　In McGinley v. United States Life Ins. Co., 77 N. Y. 497, the court, per Miller, J., say:

"When it is intended to except to a specific proposition or to particular remarks of a judge in his charge to the jury, the counsel making the exception should put his finger on the proposition clearly and distinctly, beyond any question, and employ language entirely plain, so that there can be no doubt as to the real character of the exception, or as to what was actually intended. This is essential to enable the judge to correct, modify, or change the language used, if he deems it proper, and to prevent any misconception or misapprehension as to what portion of the charge the exception was intended to apply. To obtain the advantage of an exception as to language used in the charge, it must be presented either in the same or in equivalent words, or so as to embrace the substance of the charge, and not in phraseology which is at least of a doubtful construction."

This case is cited and approved in Brozek v. Steinway Railway Company, 161 N. Y. 63, 65, 55 N. E. 395. In People ex rel. Dailey v. Livingston, 79 N. Y. 292, the court say:

"The learned counsel for the relator in answer to this point insists, first, that the exception was not sufficiently specific. At the close of the charge several requests to charge were made by the respective parties, and then the case states that the defendant excepted to the closing of the charge in regard to the ballot boxes. It would have been strictly more accurate to have repeated the language excepted to, but the exception referred to the close of the charge and the subject. There was but a single idea in that part of the charge, and that was expressed in clear and emphatic language. The exception could not have referred to anything else, and it is difficult to see how there could have been any misapprehension as to the application of the exception. We think that the rule requiring specific exceptions was substantially, if not technically complied with."

I fail to see how the exception could be more precise and definite. It is not the rule that the exceptor is bound to state the reason for his challenge to the law of the instruction. In Requa v. Holmes, 16 N. Y. 202, the court say:

"In excepting to a charge all that is necessary is to specify the legal proposition therein supposed to be objectionable. In this case the whole charge consisted of but a single legal proposition, and a general exception thereto was sufficient. It was unnecessary to state the reasons why the charge was, or was supposed to be, erroneous."

In Goldman v. Abrahams, 9 Daly, 223, the court say:

"The proposition of the charge, in view of the evidence, was erroneous, and to that erroneous proposition an exception is taken. In an exception to a charge counsel are not bound to state the grounds of their exception. They are simply called upon to except to such propositions as they deem erroneous; and this raises the question of law in a proper form."

In Freund v. Paten, 10 Abb. N. C. 316, the court say:

"The instructions given the jury were plainly not in accord with the legal rule, and more strongly marked by the omission of the term 'reasonable' in qualification of the word 'doubt.' The plaintiff's counsel, by excepting to the court's charge of legal propositions, did all that was needful to present the question. Under such circumstances counsel are not called upon to suggest amendments or changes to the court; but may rely upon the exception. Goldman v. Abrahams, 10 Wkly. Dig. 108; Allis v. Leonard, 58 N. Y. 291."

See, too, Brick v. Fowler, 12 Wkly. Dig. 310; Allis v. Leonard, 58 N. Y. 288; Baylies' Trial Practice, 336; 2 Rumsey's Practice (2d Ed.) p. 368.

As stated in the last authority cited, if the error was merely inadvertent, like the misuse of a word or a slip in phraseology where it is perfectly clear that the court could not have intended the expression used, courts have been inclined to require that the exception should suggest the correction; e. g., Ellis v. People, 21 How. Pr. 360; Simmons v. Ocean Causeway, 21 App. Div. 36, 47 N. Y. Supp. 360. But I think that the appellant·should not be deprived of the benefit of his exception on the ground that the instruction was an inadvertence. The learned court three times instructed the jury that the law required that the president verify the reports by absolute oath; and never made mention of the fact that the oath as required was but a qualified one. In the dissenting opinion of my Brother GAYNOR it is said that it was the duty of the learned counsel for the appellant in excepting to point out the error, but Kramer v. Brooklyn Heights R. R. Co., 190 N. Y. 310, 83 N. E. 35, alone is cited as an authority. That case only contains the proposition that a party should not be allowed upon appeal to take advantage of a lack of proof of a fact when it was assumed by both parties, and the court at trial that the fact was admitted or at least not contraverted.

The second question is whether the exception was well taken. The instruction of the court was not a correct statement of the statute existing at the time of these thefts; for the provision of Banking Law, Laws 1892, p. 1853, c. 689, as amended by Laws 1898, p. 958, c. 333, then was and now is (section 20):

"Every such report shall be verified by the oath of the president and cashier or treasurer of such corporation or by such individual banker, to the effect that the same is true and correct in all respects, to the best of his knowledge and belief."

Thus it appears that the learned court charged that the law was that the president must verify by an unqualified oath, when the law required only an oath to the best of his knowledge and belief.

The third question is whether the error is fatal to the judgment. "If it is possible that the defendant was injured by this error, the verdict must be set aside. It is not for the defendant to show how or to what extent he was prejudiced. The existence of the error establishes his claim to relief. If the plaintiffs wish to sustain the verdict, it is for them to show that the error did not and could not have effected it"—citing authorities. Greene v. White, 37 N. Y. 405. If the court had instructed the jury that the oath was limited to the best of Prentice's knowledge and belief, can it be concluded that the jury would have found in such verification (and such was the verification actually made) evidence of negligence? It is to be noted that at no time was the oath as required by the statute stated to the jury, nor have we any proof that the jury ever heard read or ever· read the statute. Indeed, at the close of the case, the court asked the jury whether they desired to take any exhibit with them, and it does not appear that anything was submitted to them but a statement of the alleged items of loss. Even if the jury had before them in their jury room the reports as verified, can it be at all certain that they would have assumed that the reports were verified

according to the statute when the court had instructed them that
the oath thereto must be absolute? The verdict itself seems to in-
dicate that the reports influenced the jury, for the following rea-
son: The verdict represents the total deficit less $22,930 collected
from Ahlmann's estate and $9,000. This $9,000 item represented
a specific entry in the books of a loan to Ahlmann on August 8, 1903,
without corresponding entry of repayment. The learned court charged
the jury that, whereas the other items of defalcation were due to
acts of Ahlmann previous to the signing of the last quarterly re-
port by Mr. Prentice, "the loan to Ahlmann himself [i. e., this
$9,000 item] was made after the last quarterly report." The court
was referring to the last report signed by Mr. Prentice, as it ap-
peared that the final report was verified by Ahlmann alone at a time
when Mr. Prentice was ill. Thus the jury, told by the court that
the loss of $9,000 (as to which there was no conflicting evidence)
was alone subsequent to any report signed by Mr. Prentice, ex-
cluded it alone from the alleged sum total of the loss. The action
was not brought for the falsity of the reports under section 21 of
the banking law or section 611 of the Penal Code, but, as I have
said, it rested upon negligence. These reports were read in evi-
dence on the theory that the verification thereof by Mr. Prentice
was a prescribed duty of the president. The statute requiring the
oath does not prescribe in what respect the president or the cashier
shall qualify himself to make the oath. It does not in any way
bear on the supervising duties of either officer with reference to the
affairs of the bank. The report is required of the officers by statute
in order that primarily the banking department, and, secondarily,
others by publication thereof may have information from the prin-
cipal officers of the bank of its condition, attested by their oath
made to the best of their knowledge and belief. If it be false, the
direct remedy may be found in section 21 of the banking law, or it
may be under section 611 of the Penal Code.

(a) A substantial difference between the oath charged and the
oath in the statute book is shown by the fact that originally the
statute read every such report should "be verified by the oath of
the president and cashier * * * to the effect that the same is
true and correct in all respects" (section 20, c. 689, p. 1853, Laws
1892), and that by an amendment made by chapter 333, p. 958,
Laws 1898, the limitation of the oath "to the best of his knowledge
and belief" was grafted upon the statute. It seems to me that the
reason for the modification is not far to seek. The Legislature
thought that a conscientious bank president or official might dis-
charge his duties to the full, and yet be not qualified and could not
in the nature of things qualify himself to make positive oath to the
report and its details. The original requirement might exclude that
kind of man required to discharge the duties of president or of
cashier, and thus limit the occupancy of such places to those who
would take such an oath without compunction, though it might, in
fact, be "false as dicers' oaths."

(b) I think that the jury in passing upon the negligence of Mr.
Prentice as evidenced by his acts of omission indicated by his act of

commission in verification of the report might not have found proof of his neglect therefrom if they had been informed, not that he must verify each report on oath, but on oath limited to the best of his knowledge and belief. Might not the jury, regarding the limitation of the oath in considering the qualification of the affiant, draw a distinction between the conscientious state of a mind required to make an oath or an oath to the best of his knowledge and belief? Might not a jury have concluded that Mr. Prentice was negligent in his qualification upon the facts, when he came to take a positive oath and have concluded that he was not thus negligent when he came to take an oath to the best of his knowledge and belief? Knowledge may mean that gained by information or intelligence. Webster's Dictionary; Worcester's Dictionary; Century Dictionary; Imperial Dictionary; Stormonth's Dictionary. "Knowledge is information and information knowledge," and it is "not confined to what we have personally observed." Bouvier's Law Dictionary, citing authorities. See, too, Iron Silver Mining Co. v. Reynolds, 124 U. S. 384, 8 Sup. Ct. 598, 31 L. Ed. 466; Lambert v. People, 76 N. Y. 220, 227, 228, 32 Am. Rep. 293. To one's knowledge means "so far as one is informed." Century Dict. Knowledge and belief is nothing more than a firm belief. Anderson's Law Dict. We must take the word in its common acceptation; its plain, common, ordinary meaning. Utley v. Hill, 155 Mo. 232, 55 S. W. 1091, 49 L. R. A. 383, 78 Am. St. Rep. 569.

What was the negligence attributed to the verification of the report? I admit that, as the rule is that the respondent must establish that the error could not have affected the verdict (Greene v. White, supra; People v. Smith, 172 N. Y. 243, 64 N. E. 814), a discussion of this question is perhaps unnecessary, even for the purpose of showing that the jury might have absolved the president if they had been instructed that he was only required to make a qualified oath to the reports. And I do not intend to be understood as intimating, much less declaring, that, if the court had charged the jury correctly as to the oath, the jury could not have found negligence in the circumstances surrounding the verification of the reports by Prentice.

(a) It does not satisfactorily appear that the opportunity to ·thus dispose of the securities was due to any failure on the part of Mr. Prentice to inspect the books, and the investment account of the bank prior to the verification of the report. The reports, verified by Mr. Prentice and Ahlmann, seem to be in accord therewith. It is true that the investment account did not, as it had prior to 1902 and 1903, specify the securities nor were they specifically listed in the books; but that is another matter. Whether Mr. Prentice knew this does not appear; but Mr. Wood knew it. The state examiner had seen that system (or omission, if you please), but it did not appear that he had made any sign or had taken steps in the way of requiring change of method. The negligence asserted necessarily was that Mr. Prentice· did not see that the securities were on hand at the time when he verified the reports. The bank was in Stapleton, Richmond county. It was incorporated in 1885 with a capital of $25,000 of 500 shares with par value of $50 a share. When Ahlmann died, he owned 347

shares.   Augustus Prentice owned 10 shares.   Ahlmann had been cashier since 1887, and always had owned a majority of the stock. He lived on Staten Island, was of good social standing, had gained the respect of the people about him, and had demeaned himself so as to command confidence for his integrity and for his character.   He was diligent and constant about the bank's business.   In fine, he was practically the bank, in its dealings with depositors and customers, as well as in its administration.   Prentice had been president for many years.   He was a lawyer with an office in Manhattan, New York City, where he lived.   When these thefts were made, he was 77 years old, with impaired eyesight due to cataract which hindered his movements, and even made it difficult for him to sign his name.   Of course, he is not to be acquitted of blame because of these infirmities, but I am stating all the circumstances.   So far as the management of the bank in the bank itself or in its business routine with customers or depositors, he took little part in the latter years.   No specific duties were cast upon him by resolution or by law.   He received a salary of $500 a year.   Ahlmann's salary was $5,000 a year.   Of the other directors, Finch lived near the bank, and was a lawyer, with his office in connection with that of Prentice.   A. B. Prentice was the son of Augustus Prentice, a lawyer with offices with his father; and Wood was the assistant cashier, who had worked his way up in the bank.   Ahlmann went to the offices of Mr. Prentice twice a week, and would stay there about an hour discussing the bank, the different loans, the standing of the people in its community—whether they were people who should receive loans   A. B. Prentice would often enter into the discussion, and Finch also would often take part.   Up to December 18, 1902, the bank stood examination.   The state examiner then found matters correct, and saw the assets of the bank, and checked them with the books.   Mr. Prentice was not an insurer of the honesty of the cashier.   Bloom v. Nat. United Benefit Savings Co., 81 Hun, 127, 30 N. Y. Supp. 700, and cases cited; Id., 152 N. Y. 114–121, 46 N. E. 166; Scott v. Depeyster, 1 Edw. Ch. 512.   The duty of the president is to preside; and his other duties may vary according to usage or by-law of the institution.   "Ordinarily the position is one of dignity, and of an indefinite general responsibility, rather than of any accurately known power."   He, however, is "usually expected to exercise a more constant, immediate, and personal supervision" than an ordinary director.   Morse on Banks & Banking, § 143. The mere fact that Ahlmann had physical control of the securities was not necessarily evidence of the negligence of Mr. Prentice.   Ahlmann as cashier was presumed to be the "principal executive officer of the bank" (City Bank of New Haven v. Perkins, 29 N. Y. 554, 86 Am. Dec. 332.   See, too, Potter v. Merchants' Bank, 28 N. Y. 641, 86 Am. Dec. 273, citing Story, J., in Wild v. Passamaquody Bank, 3 Mason, 505, Fed. Cas. No. 17,646), and the facts show that he was the chief managing officer of it.   Story, J., in Wild v. Passamaquody Bank, ut supra said:

"The cashier of a bank is, virtute officii, generally intrusted with the notes, securities, and other funds of the bank, and is held out to the world by the

bank as its general agent in the negotiation, management, and disposal of them."

See, too, United States v. City Bank of Columbus, 21 How. (U. S.) 356, 364, 16 L. Ed. 130.

"The cashier of a bank is ordinarily its chief executive officer, through whom the financial operations of the bank are conducted. Directly or through subordinate officers, he receives and pays out its moneys, collects and pays its debts, and receives, discharges, and transfers its commercial securities." 21 Am. & Eng. Ency. of Law (2d Ed.) 862; Coats v. Donnell, 94 N. Y. 168, 176; Merchants' Bank v. State Bank, 10 Wall. (U. S.) 604, 650, 19 L. Ed. 1008. See, too, Morse on Banks and Banking, § 157, and cases cited; section 160, and cases cited. There was the legal right to impose confidence in Ahlmann in everything within the scope of his duties. Scott v. Depeyster, 1 Edw. Ch., especially at pages 540 and 541. It does not appear but that the cashier with the securities at hand in the bank and under his control could not as readily have abstracted them and disposed of them as he did from the safe deposit box in Manhattan. He did not obtain them from the safe deposit box in Manhattan and fly; but he took them therefrom and sold them in the market as for account of the bank, and received a check therefor in favor of the bank. The bank cleared with a bank in Manhattan, and the securities were a reserve fund kept near the financial district to raise money speedily if required. The fact that they were kept there did not make the cashier immune from producing them if called upon to do so any more than if they had been kept in the bank vaults. The point of this discussion is that the mere place of deposit and the absolute control of the cashier thereat do not necessarily in themselves indicate any greater laxity than if the securities had been kept in the bank under the normal control of the cashier. The reports were prpared by Ahlmann or under his supervision, and were then brought over by Ahlmann to Mr. Prentice, who would look them over and consult with his son, who would make suggestions. The conversions over the affairs of the bank on such days were protracted beyond the usual hour, and were about the details of the report. Mr. Prentice would take time to consider the report before he signed it. Mr. Wood began to work in the bank in 1887, and rose to assistant cashier in 1895, and became a director in 1896. He was paying and receiving teller and always at the bank, save vacation time. He examined the daily balance book every day. "To some extent" he was in supervision of the bookkeeping, and the routine work thereof in a general way was in his charge. He had no suspicion at any time that "anything was wrong with the bank," and, so far as he knew, everything was in proper shape and in good order until Ahlmann killed himself. Ahlmann came then to Mr. Prentice with the reports as the managing agent of the bank, who apparently had administered its affairs under the scrutiny of the bank examiners successfully and with diligence for many years. He was the chief executive officer, the practical power in the bank, and had so far as the evidence shows achieved a reputation in his community such as attaches to a substantial man of

affairs, diligent, constant, and attentive about his business. He own-
ed the great majority of the stock in the bank. And he, too, then
represented himself to Mr. Prentice as prepared to take his oath to
the same report. All these circumstances might not be sufficient to
acquit the president, but they are of the atmosphere of the case. It
is true that it is argued that Mr. Prentice had warning of Ahlmann's
character by his lapse in 1890 in the matter of the forgery of two
notes, but the learned court charged the jury that there was no evi-
dence that permitted a finding that the forgeries ever existed. It
seems to me that the question whether the president was negligent in
failing to see the securities at the time he made the verification of
the report was a question of fact for the jury, and was not to be dis-
posed of as one of law. Mr. Prentice is to be regarded as a trustee
(Hun v. Cary, 82 N. Y. 65, 37 Am. Rep. 546; Bosworth v. Allen,
168 N. Y. 157–165, 61 N. E. 163, 55 L. R. A. 751, 85 Am. St. Rep.
667), and bound to exercise care and prudence in his office in the same
degree that men of common prudence ordinarily show in their own
affairs (Hun v. Cary, supra). The measure of that care is depend-
ent on the subject to which it is due, and each case must be determin-
ed by the circumstances thereof. Morse on Banks and Banking, §
128, citing Briggs v. Spaulding, 141 U. S. 132, 11 Sup. Ct. 924, 35
L. Ed. 662. The discussion in the dissenting opinion lays much
stress on the fact that Prentice had warning of the character of Ahl-
mann by knowledge of his prior misconduct in the affairs of the bank
involving his fabrication or forgery of two notes to make up a deficit.
Even if such forgery by Ahlmann had been proved and made known
to Prentice, that bit of evidence would not have directly borne upon
my proposition that an exception was well taken to an instruction
as to the law, which was fatal to the judgment. Such fact would be
germane to the question whether the evidence was sufficient to up-
hold a judgment against the defendant for his negligence. It would
only be relevant to the question which I discuss in so far as it involv-
ed the subsiduary question whether the error was substantial or fa-
tal. It is quite true that I myself make mention of the circumstance,
and hence in a sense invite the comment of my Brother; but that
was in the course of showing the atmosphere of the case. But, while
the court did instruct the jury that there was evidence in the case
that Mr. Prentice was informed in March, 1890, that the cashier had
admitted the forgery of the two notes, I repeat that the learned court
without objection and exception charged that there was no evidence
in the case from which the jury could find that the notes were forged.

I repeat that I do not assume to say that if the learned court, who
tried the case with much fairness and ability, had instructed the jury
as to the terms of the oath required by the statute and had submitted
the case to the jury without instruction as to Mr. Prentice's negli-
gence as matter of law, and thereupon a like verdict had been re-
turned, we would have had cause to disturb it. But I am convinced
that we cannot uphold this verdict on the ground that the trial was
without substantial error to the prejudice of the defendant.

The judgment must be reversed and a new trial granted, costs to abide the event.  All concur, except GAYNOR, J., who dissents.

GAYNOR, J. (dissenting).  The law in respect of the duty of bank directors to their bank is settled in this state.  They are trustees of the bank, and are "bound to exercise care and prudence in the execution of their trust, in the same degree that men of common prudence ordinarily exercise in their own affairs"; and for failure in this they are liable in damages to the bank.  Hun v. Cary, 82 N. Y. 65, 37 Am. Rep. 546.  The measure of the care and supervision required of a director who is also president of the bank (as was the case here) is this and something more, according to his extra duties of care and supervision as president required generally by law, or put upon him by the power and duties entrusted to his position by his directors, by the by-laws, or by the custom or course of business in his bank.  The learned trial Judge charged the jury that the duty of the deceased president, for whose negligence this action is brought by the Receiver of the bank against his administrator, "was to exercise the same care in respect of the function of his office, both as director and as president, as a man of ordinary business capacity and prudence would exercise in the conduct of his own interests."  This was so fully explained and reiterated that the jury must have fully understood it, and the charge of the learned trial judge may not be understood as departing from that to some other rule, unless it does so expressly or by necessary implication.

The cashier of the bank stole securities of the bank, and the question was whether the negligence of the president, measured by the requirement of his duty of care and supervision, as laid down by the learned trial Judge as stated above, enabled or encouraged him to steal them.  The evidence showed not only general inattention by the president to the bank's business during several years before the theft, but also that he had during the same time signed and sworn to the quarterly reports to the state banking department, giving, as the law requires, a particular statement of the items of assets of the bank, without ever looking to see whether the securities so reported were among the bank's assets.  There was also evidence by the state superintendent of banks that after an examination of the affairs of the bank in 1890 (two to three years before the theft) he and the examiner who had made the examination went to the president and informed him that they had found a deficiency of $5,810 in the bills discounted compared with the amount shown by the ledger as the total amount of such discounts, and that after the discovery, and while the examination was in progress, two notes amounting to such deficiency, and purporting to be made one by "H. Kirchman" and the other by "Chas. Beinert," which they exhibited to the president, were put among the bills and found there by them before their examination was completed, and that the cashier when spoken to by them about such notes, and shown them, admitted that he had made them.  The witness kept them and produced them on the trial.  It is minimizingly said that although this information was communicated to the president, there was really no evidence that the notes were forgeries

within the requirements for a conviction under the Penal Code. This technicality is entirely aside from the point, and does not diminish the force of the evidence. The president was informed of the deficiency, and that the cashier had privily slipped in two notes to make it up, and when confronted by the bank superintendent with them acknowledged that he had made them; i. e., that they were fictitious or forged by him. Having such information of the cashier his duty of care and supervision over the affairs and assets of the bank was certainly increased if he was to permit the cashier to retain his position under him, or remain president over such a cashier, which he did.

This being the state of the case, it was claimed on the trial that the neglect of the president to examine the securities, and his continually making the quarterly reports to the banking department of their possession by the bank without looking to see if that was true, encouraged the cashier to believe, and taught him, that he could take them without danger of such a derelict president making discovery of his theft, and that in that way the neglect of the president led to such theft. This naturally led the learned trial Judge to charge on that head, and no exception was taken to his entertaining that view of the case. The exception principally relied on is to his charge that it was the president's duty "to have such knowledge of and such acquaintance with the several matters stated in the quarterly reports that he could truthfully make oath that the said reports were true in all respects"; and later on that it was his duty "to keep himself sufficiently informed, sufficiently familiar, with the affairs of the bank and the conduct thereof — not alone by the cashier, but the general conduct, and the investment of securities, and the securities on hand, to enable him truthfully and faithfully to comply with the requirements of the statute that he verify on oath the several quarterly reports, as to the details thereof."

The criticism of this is that it says that the president had to make a positive oath to the quarterly reports that they were "true in all respects," whereas the oath required of the president by statute was that they were "true and correct in all respects, to the best of his knowledge and belief"; and that it therefore sets up a standard of care higher than that which the learned trial Judge had already so carefully charged the jury was the standard, viz., that the care and oversight had to be such as to enable the president to make a positive oath, i. e., of his own personal knowledge, that the securities were in the bank's possession. But it is not justly nor honestly open to such a criticism. The learned trial Judge correctly said that the president had to make oath to the report that it was "true in all respects." That is what the statute requires. He was not speaking of the form or quality of the oath; he did not say that the oath had to be positive, or of the affiant's own knowledge. He simply said that an oath had to be taken that it was true, and this was strictly true. The form and quality of the oath was another matter. No one understood him as saying that the oath had to be a positive one. The express words of the statute left no room for discussion as to the form of oath it prescribed. If the learned trial Judge had made an inadvertent error in respect of it, from lack of

memory or otherwise, it was the duty of counsel for the defendant to call his attention to such error, or slip, if they deemed it detrimental to the defendant. If they had so understood him as charging in respect of the form of the oath, and that it had to be positive, it would have been their duty to point out such error, and have it corrected. Not having done so they may not claim such error now. It is an old rule that having remained silent when they should have spoken they will not be heard now. Kramer v. Brooklyn Heights R. Co., 190 N. Y. 310, 83 N. E. 35. But no one understood the trial Judge in the way now claimed. The quarterly reports had been received in evidence, and read to the jury, and every one knew the form of the oath to them, and there was no question about its correctness, or that a more stringent oath was required. No one understood the trial Judge as charging that the form of the oath was wrong—that it should have been in positive words. Really, the understanding of jurors is not so thick or feeble as we are now asked to believe by the contention that they understood that they were instructed that the oath had to be positive.

But even if the learned trial Judge had charged the jury that it was the duty of the president to take the trouble to look at the securities before making the report, instead of taking the bare word of his cashier, would we say it was error?—especially as he was credibly informed that his cashier had already embezzled the money of the bank and tried to conceal it by fabricating two fictitious notes. Can the law permit the suggestion that a prudent man would, dealing with his own affairs, take the word of such a man in such a matter? If, not, the question is not one of fact but of law. That his oath might be to the best of his knowledge and belief did not permit him to go without knowledge which was at hand and accessible.

There are other exceptions to the charge on the ground that the learned trial Judge charged negligence as matter of law on certain facts enumerated by him, but on referring to the text it is found that the charge was that the jury "may" or "might" find negligence therefrom, the question being thus left to the jury as one of fact.

If there be any error presented, it is not of sufficient gravity to justify the reversal of a wholesome and just judgment. Persons who accept trusts must be made to understand that they enter into solemn obligations and corresponding liabilities thereby. The swindled depositors of this bank are entitled to have this case judged in a broad and wholesome spirit of accountability of bank directors and officers. Much has been made of the fact that the cashier received a large salary and the president a small one, and that the latter was aged and somewhat infirm; but such considerations have to be inexorably suppressed.

The judgment should be affirmed.