[Civil No. 2764. Filed May 19, 1930.]

[288 Pac. 7.]

CALIFORNIA BANK, a Corporation, Appellant, v. A. T. DANIEL, J. T. ASHURST, A. L. HILL, GEORGE McCARROLL and J. H. HAYNES, Appellees.

Messrs. Swanwick & Donnelly, and Mr. Clement H. Coleman, for Appellant.

Mr. H. H. Baker and Mr. R. N. Campbell, for Appellees.

LOCKWOOD, C. J.—In January, 1927, California Bank, a corporation, hereinafter called plaintiff, made two separate loans of $10,000 each to Gadsden State Bank, hereinafter called the bank, located in

Yuma county, Arizona. These loans were evidenced by two promissory notes, one dated January 18th, 1927, and the other January 25th, 1927, each payable ninety days after date, and duly executed in the name of the bank by its president and secretary. Each note was guaranteed by a written indorsement signed by A. T. Daniel, J. T. Ashurst, A. L. Hill, George McCarroll and J. H. Haynes, hereinafter called defendants, and at the time comprising all of the officers and directors of the bank. The circumstances under. which the loans were made were as follows: Defendant Ashurst for some time prior to and during all the transactions connected with the loans was the secretary and cashier of the bank. The other directors and officers left practically its entire management to him, with the exception of the approval of loans made by the bank; and at least part of them were fully aware that he expected to borrow money for the bank from plaintiff about this time, and would have to pledge collateral therefor.

In the early part of January, 1927, Ashurst applied in person to plaintiff, which for some time had been the bank's correspondent in the city of Los Angeles, for the loan evidenced by the note dated January 18th; and at the time it was made, delivered to plaintiff said note, which had previously been executed and signed by the maker and guarantors in Arizona for the purpose of obtaining such a loan. This note was not secured by any collateral, but at the same time Ashurst stated that he might want an additional loan of $10,000, and that if he did, he would give collateral security for both loans and a special pledge agreement. The amount of the loan was credited to the current account of the bank then being carried with plaintiff. About a week later, Ashurst applied for the additional loan of $10,000, for the purpose, as he stated, of building up the reserve

of the bank. James Forsyth was plaintiff's agent in all of the transactions, and he stated to Ashurst that, if the bank secured the additional $10,000, it would have to put up sufficient collateral to guarantee both loans and execute a special pledge agreement in writing, in accordance with their previous conversation. The latter agreed to all these conditions, delivered the note dated January 25th to plaintiff, and left, taking with him the written special pledge agreement to be executed in Arizona and forwarded with the collateral immediately; and an additional credit of $10,000 was then given the account of the bank with plaintiff. With the exception of a few hundred dollars, the proceeds of both loans were actually used by the bank before it was closed.

On the 7th of February, a meeting of the directors of the bank was held, and a resolution passed authorizing the president and cashier to borrow from plaintiff amounts not exceeding $50,000 in the aggregate, and to pledge the assets of the bank as security for such loans under such terms as might be required by plaintiff. The collateral and pledge agreement promised by Ashurst not having been received by plaintiff on February 8th, Forsyth wrote Ashurst reminding him of his promise; but, receiving no reply, telegraphed him on February 25th, insisting upon the collateral and pledge agreement being forwarded. Ashurst immediately wired that they would be mailed the next day, and followed the telegram by a letter inclosing the signed agreement and various negotiable notes, some of which were secured by chattel mortgages, amounting to a little more than $20,000.

About a month later the bank was closed by A. T. Hammons, then state superintendent of banks of Arizona, for liquidation. A short time thereafter plaintiff communicated with Hammons, advising him of the indebtedness of the bank and the collateral

it held as security therefor, and asking for instructions as to procedure, to which Hammons replied that, if the plaintiff desired to depend upon the collateral and guaranty rather than a claim as general creditor, it would not need to file any claim with him. Plaintiff then sent its representatives to Arizona to investigate the value of the collateral and to try to secure an amicable adjustment of the matter. No agreement being reached with the guarantors, plaintiff's agents made a survey of the value of the collateral and later forwarded it to the Security Trust & Savings Bank at Yuma for collection, receiving remittances on account thereof from time to time. On May 20th, 1927, this suit was entered against the guarantors on the notes, and, pending a filing of an answer to the original complaint, after giving defendants written notice of its intentions, plaintiff proceeded to sell on September 12th at public auction the collateral then remaining uncollected, under its pledge agreement and the provisions of the California statute; the Security Trust & Savings Bank being the purchaser. It brought the sum of $9,750, which, together with other amounts previously collected on the collateral and some other credits of the bank, was applied by plaintiff on the notes in question, resulting in the full payment of the first note, and partial payment of the second, and leaving, according to the claim of plaintiff, a balance of $6,210.20 still due on the second note, with interest at six per cent from September 12th, 1927. Thereafter defendants answered, and plaintiff filed a supplemental complaint setting forth the sale of the collateral and accounting for the proceeds. This last complaint defendants, except Ashurst, who had defaulted, answered, admitting the making of the loans and guaranties, and the pledging of the collateral, but claiming that the resolution of February 7th passed by

the board of directors did not affect the collateral already pledged on the loan, but was to apply only for the purpose of securing an additional $10,000 loan which was never made. They. further alleged that the special pledge agreement actually made was *ultra vires* and without consideration; that plaintiff had converted the collateral by selling it, and that the sale was not legally made or fairly conducted. The issues were joined before a jury, which returned a verdict in favor of defendants, on which judgment was rendered; and, after the usual motion for new trial was overruled, plaintiff brought the matter before us for review.

There are some five separate assignments of error, but we shall consider the appeal on the general legal questions involved, in their logical order. The first question is whether or not plaintiff was authorized to sell the collateral pledged when the notes it secured were not paid at maturity. It is the general rule of law that the pledgee of commercial paper held as collateral security cannot sell such paper in the absence of a special power of sale in the contract of pledge. *Joliet Iron Co.* v. *Scioto Fire Brick Co.,* 82 Ill. 548, 25 Am. Rep. 341; *Wheeler* v. *Newbould,* 16 N. Y. 392; *Moses* v. *Grainger,* 106 Tenn. 7, 53 L. R. A. 857, 58 S. W. 1067. The pledgor may, however, grant such right, in which case a sale may be made in accordance with the contract. *Hunter* v. *Hamilton,* 52 Kan. 195, 34 Pac. 782; *McDowell* v. *Chicago Steel Works,* 124 Ill. 491, 7 Am. St. Rep. 381, 16 N. E. 854.

The form of special pledge given Ashurst by Forsyth at the time the second loan was made, and executed by the bank through its president and cashier under date of February 25th, unquestionably grants such power of sale. It is contended, however, by defendants (a) that it was not within the power of the cashier to agree that such a pledge should be

given; (b) that the only authority granted by the board of directors to give such pledge was made long after the loans had been completed, and for the purpose only of securing an additional loan which was never made; and (c) that the pledge as executed and delivered February 25th was without consideration and therefore void. The loans were made January 18th and 25th, respectively, and the resolution of the board of directors authorizing a pledge of the nature in question was adopted February 7th and is contained in the record. It is ambiguous on its face as to whether it was to apply to past or future loans. In such case, parol evidence was admissible to determine the question, and, the directors having testified that it was for future loans only, the question would be for the jury under proper instructions, if plaintiff relies upon such resolution to give validity to the pledge agreement. Plaintiff, however, contends that the agreement was complete at the time of the second loan, the formal execution of the written pledge and the actual delivery of the collateral being merely a compliance with the contract already made between Forsyth, acting for plaintiff, and Ashurst, acting for the bank. That Forsyth did demand both the deposit of the collateral and the execution of the special pledge agreement as a condition to the making of the second loan, and that Ashurst, on behalf of the bank, agreed thereto is not disputed. We then must determine whether or not Ashurst had the authority to bind the bank by such agreement.

Generally speaking, the cashier has greater inherent powers than any other officer of the bank, and is ordinarily its active financial manager and agent. *McBoyle* v. *Union Nat. Bank,* 162 Cal. 277, 122 Pac. 458; *Davenport* v. *Prentice,* 126 App. Div. 451, 110 N. Y. Supp. 1056; *Knapp* v. *Saunders,* 15 S. D. 464, 90 N. W. 137; *Montgomery Bank & Trust Co.* v.

*Walker,* 181 Ala. 368, 61 South. 951. His acts within his official sphere are binding on his bank: *Knoxville Water Co.* v. *East Tennessee Nat. Bank,* 123 Tenn. 364, 131 S. W. 447; 7 C. J. 550. While some of the earlier cases hold to the contrary, it is the modern rule that a cashier has power to borrow money for the use of the bank in the ordinary course of business: *Williams* v. *Hall,* 30 Ariz. 581, 249 Pac. 755; *Union Nat. Bank* v. *Lyons,* 220 Mo. 538, 119 S. W. 540; *Barnes* v. *Ontario Bank,* 19 N. Y. 152; *Ballston Spa Bank* v. *Marine Bank,* 16 Wis. 120; *State Bank of Pike* v. *People's Nat. Bank,* (Sup.) 118 N. Y. Supp. 641; and to pledge collateral to secure notes given by the bank: *Williams* v. *Hall, supra; Sloan* v. *Kansas City State Bank,* 158 Mo. 431, 57 S. W. 1056; *Powers* v. *Woolfolk,* 132 Mo. App. 354, 111 S. W. 1187; *Citizens' Bank* v. *Bank of Waddy's Receiver,* 126 Ky. 169, 11 L. R. A. (N. S.) 598, 128 Am. St. Rep. 282, 103 S. W. 249. But if a cashier may pledge collateral security, we think in reason and logic he has authority to agree to any reasonable and customary terms of such pledge. Particularly is this true when he is also acting as general manager and the lending bank has no cause to doubt his authority to give a pledge or to suspect any limitations on such authority. In the case at bar, the first note delivered by Ashurst was guaranteed by every officer and director of the bank. He was told at the time that any further loan would require collateral security as well as the guaranty for both loans; and, when he appeared and asked for the second loan, the note in that case also bore the guaranty as in the first case. Further, the bank received the full benefit of Ashurst's agreement. Under all these circumstances, we are of the opinion plaintiff was authorized to rely upon Ashurst's promise that the bank would execute the special pledge with power of sale

and that the bank is estopped from questioning such authority. *Hawkins* v. *Fourth Nat. Bank,* 150 Ind. 117, 49 N. E. 957; *Cox* v. *Robinson,* 82 Fed. 277, 27 C. C. A. 120; *United States Nat. Bank* v. *First Nat. Bank,* 79 Fed. 296, 24 C. C. A. 597; *Davenport* v. *Stone,* 104 Mich. 521, 53 Am. St. Rep. 467, 62 N. W. 722. Such being the case, defendants are also estopped. 28 C. J. 911. We hold, therefore, that plaintiff was entitled to sell the collateral security in question by virtue of the special pledge agreement made by Ashurst at the time of the loan and formally executed thereafter by the bank, and that such authority was in no way dependent on the resolution of February 7th.

It is urged, however, that, notwithstanding plaintiff might have had authority to sell the collateral, it made the sale contrary to the terms of the agreement. It is, of course, true that a sale of pledged collateral contrary to the terms of the pledge amounts to a conversion and extinguishes the principal debt to the extent of the actual value of the collateral at the time of conversion. Was the sale in this case made in accordance with the terms of the pledge?

The trial court held, and we see no reason for disagreeing with its conclusion, that the special pledge agreement was actually made in the state of California. Such being the case, it was necessary to make the sale in accordance with the law of that state. The only criticism suggested by defendants is that, under the law of California, it is necessary that the property sold in a case like this be "within view of those who attend the sale, and must be sold in such parcels as are likely to bring the highest price. . . . " It is claimed this provision of the statute was violated, in that a payment had been made just before the sale at the Security Trust & Savings Bank in Yuma on two of the collateral notes, and sight drafts

issued therefor for transmission to plaintiff. It is urged that the notes had been partially converted into these drafts, and that therefore the drafts themselves should have been present at the sale. The record shows that plaintiff had no knowledge at the time of the existence of the drafts. We may admit for the sake of the argument that they were substituted *pro tanto* for the notes, and, if they were in the possession of plaintiff, should have been present at the sale. The law, however, does not require an impossibility, and, since the drafts were not in possession of or known to the plaintiff, it was not a violation of the statute to make the sale without their physical presence. We are of the opinion the record shows the sale was legally conducted, so far as form was concerned.

It is further contended by defendants that plaintiff failed to credit the proper amount on the indebtedness of the bank. This objection covers two features: First, a deduction of some $31 commission paid the Security Trust & Savings Bank of Yuma for collecting a certain amount of the collateral; and, second, two trade acceptances aggregating $1,684.12 sent by the bank to plaintiff for collection and held by it at the time of the insolvency of the bank. These acceptances when collected were credited on the notes to the extent of $1,135.53; the balance being used to make up a check drawn by the bank on plaintiff and through the latter's error paid after the insolvency of the former. These credits were approved by Hammons as bank examiner and receiver. So far as the last item was concerned, the error, if any, was in favor of the bank and therefore of defendants. The trade acceptances were not part of the collateral pledged. Defendants as guarantors were entitled to have applied on the notes guaranteed only the collateral pledged. If these acceptances were the property

of the bank in the possession of plaintiff, the latter could properly credit them on any other indebtedness, such as the check paid by error. If, on the other hand, they were merely placed with the bank for collection and accepted by it subject to collection, they were the property of the drawer and no portion thereof should have been credited on the notes. 7 C. J. 597 et seq. Defendants, instead of suffering a loss, actually gained a benefit of something over $1,100, which they might not have been entitled to, as under the circumstances their only right in the acceptances was to be subrogated to the rights of the bank, which were, at most, to have applied on the notes whatever indebtedness was owing by plaintiff to it after adjusting their general balance. So far as the other item is concerned, the Code of California authorizes the deduction of the necessary expenses, both of sale and collection in the case of the sale of a pledge. Section 3008, Civil Code of California.

There remains for consideration, then, but one question, and that is whether or not the sale was "fairly" conducted. It is, of course, the law that, as to both defendants and the bank, plaintiff stood in the position of a trustee regarding the collateral which it held. *United Bank & Trust Co.* v. *Jones,* 30 Ariz. 557, 249 Pac. 747; *Hudgens* v. *Chamberlain,* 161 Cal. 710, 120 Pac. 422; 28 C. J. 1007. Does the record show that plaintiff failed to use ordinary care and good faith in selling at the price and under the circumstances it did?

We are of the opinion, on examining all the evidence offered on this issue, that it was not sufficient to go to the jury on the question of whether or not plaintiff failed to exercise good faith in conducting the sale. It was made at public auction, after due notice to all of the defendants, and in accordance with the California statute. So far as we can see,

the only evidence offered to show bad faith and lack of ordinary care is that some of defendants' witnesses believed that more could have been collected by plaintiff on the collateral notes if it had made some other and greater effort to collect them in Arizona. We think this is insufficient to raise the issue of bad faith for the jury. The situation is very different from what it would be had there been no authority to sell, and therefore a conversion of the collateral. In that case, plaintiff would have been obliged to account for the actual value of the collateral, regardless of its having used the utmost good faith in making the sale; but, with the right to sell given it, it was under no obligation to use any other method of collecting on the collateral; and the fact that it might have gotten more for it by proceeding in some other way was immaterial. There could be no bad faith in making the sale instead of collecting the collateral notes at maturity. The only possible actionable bad faith would have been in the conduct of the sale. *Williams* v. *Parker*, 30 Cal. App. 71, 157 Pac. 550. And of this there is no evidence. Defendants had been given several months in which to arrange to take care of the debt had they so desired. They had notice of the intended sale. They, or some of them, asked the Security Trust & Savings Bank to bid at the sale, and were advised that in its opinion the collateral was worth fifty to sixty per cent of the face value, and that it would bid a minimum of fifty per cent. It actually paid approximately sixty per cent. No other bidder appeared, nor is there in the record a suggestion of one who would have paid more under the circumstances. It is unfortunate in every case where a surety who has received no individual benefit therefrom is obliged to pay the debt of the principal debtor. When, however, a man becomes guarantor for another, he should realize the risk he

takes; and, where one of two innocent parties must suffer, the one whose negligence has rendered possible the loss must bear the burden. *Hughes* v. *Riggs Bank*, 29 Ariz. 44, 239 Pac. 297. Defendants in this case placed the cashier of the bank in such a position and with such apparent authority that plaintiff was misled to its injury thereby. They cannot now complain because they, rather than plaintiff, must bear the loss.

The judgment is reversed, and the case remanded for a new trial in accordance with the views herein expressed.

McALISTER and ROSS, JJ., concur.