**Donald K. BELSINGER, Plaintiff,**

v.

**DISTRICT OF COLUMBIA**

**and**

**James J. Kirchner, Saylor R. Garbrick, William Cox, William E. Ruffin, Jr., Irving T. Jones, Constituting the Members of the Electrical Board of the District of Columbia, Defendants.**

**Civ. A. No. 1616–68.**

United States District Court District of Columbia.

Jan. 22, 1969.

Robert M. Goolrick, Washington, D. C., for plaintiff.

Matthew J. Mullaney, Jr., Asst. Corp. Counsel, Washington, D. C., for defendants.

## MEMORANDUM OPINION

GASCH, District Judge.

On February 19, 1968, the Electrical Board of the District of Columbia or-

dered a public hearing to consider certain alleged violations of the Electrical Licensing and Bonding Regulations by Donald Belsinger. On June 18, 1968, the Board made findings of fact and conclusions of law to the effect that Mr. Belsinger had committed the violations with which he was charged. The Board suspended for one year beginning July 6, 1968, Mr. Belsinger's limited license as a Master Electrician.

Mr. Belsinger (hereinafter plaintiff) filed a complaint seeking to enjoin the Board from carrying out the suspension order. The cause came on to be heard on cross motions for summary judgment. For reasons set forth below, the Court denies plaintiff's motion for summary judgment and grants that of the defendants, the District of Columbia and the members of the Electrical Board.

The Board's order setting the case down for hearing contained three separate charges and specifications applicable to all three. The first charged that plaintiff, while licensed as a Master Electrician Specialist, did electrical work without first obtaining a permit, in violation of § 6–131 of the Electrical Code of the District of Columbia (1963 ed.) and §§ 425 and 503 of the District of Columbia Electrical Licensing and Bonding Regulations. The second charged that while holding a Master Electrician Specialist's license which was limited to "Neon and Electric sign and cold cathode lighting from existing branch circuits overcurrent devices," plaintiff did electrical work (connecting electrical hookups on gas pumps for service stations) which exceeded the limitations of his license, in violation of §§ 503 and 802 of the Electrical Licensing and Bonding Regulations. The third charged plaintiff with having engaged in the business of an electrical contractor without having first obtained a contractor's license, in violation of the same regulations cited in the second charge. The thrust of these charges, as indicated by the accompanying specifications, is that at various times between the dates of February 24, 1967, and May 8, 1967, plaintiff installed and electrically connected gas pumps at various Sunoco service stations, pursuant to an agreement between Belsinger Maintenance Co. and the Sun Oil Company. It was further alleged that plaintiff had failed to get the requisite permits, and indeed would have been ineligible for them since his license did not entitle him to do the kind of work involved. A four-day hearing was held. The Board made findings of fact and conclusions of law substantially conforming to the charges and specifications.

I. Plaintiff urges that he was deprived of due process. He argues that the action of the Board was procedurally defective in that certain pre-hearing statements indicated prejudgment, and ex parte communications between Board members and investigators, also prehearing, tainted the adjudication.

 Although the directives of the Administrative Procedure Act do not apply to an adjudicatory hearing by the District of Columbia Electrical Board,[1] it is equally clear that those sections of the Act which are merely descriptive of prior due process conceptions are constraints on the conduct of such hearings. In this regard, those charged with the responsibility of adjudicating liability under regulatory provisions carrying penalties for their violation, must be free from bias or prejudice towards the party to be judged.[2] The more difficult question is what specific acts or utterances will demonstrate bias or prejudice, assuming the decision reached is not patently unfair. In other words, what is required to satisfy the "appearance of justice."[3]

 The Court agrees that the question of when an official is disqualified to sit in judgment in a particular case

---

1. 5 U.S.C. § 551(1) (D) (1967).

2. In re Murchison, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955).

3. Offutt v. United States, 348 U.S. 11, 14, 75 S.Ct. 11, 99 L.Ed. 11 (1954).

is "one of the most difficult and delicate problems in judicial administration." [4] What is involved is due process.[5] There must be an impartial tribunal. But to assume that any tribunal approaches a cause completely devoid of predilections or initial reactions is unrealistic.[6] To nullify a ruling of a quasi-adjudicatory body on the basis of bias or prejudgment requires a substantial showing [7] of a "predetermined purpose to reach a determined end." [8]

■ In order to hold that a public stance disqualifies a tribunal, a Court should find in the import of the words or actions either the likelihood or the appearance of likelihood that the minds of the members thereof are effectively foreclosed to reason and persuasion from one side.[9]

The two leading cases where disqualification was resorted to are distinguishable from the instant case on this basis. In Texaco, Inc. v. F. T. C., 118 U.S.App. D.C. 366, 336 F.2d 754 (D.C. Cir. 1964), the Court held that Chairman Dixon had to disqualify himself because he made a speech in which he expressed great concern over an industry wide pattern of violations, and in which he named as violators those parties whose case the Board later heard and against whom the decision was rendered. It is apparent that one factor in the decision was the strong position taken by Chairman Dixon. The speech covered an area which he obviously considered crucial. The statements were made to a group encompassing members of the class of persons being rebuked. Chairman Dixon was telling members of an industry already under investigation that if they were not careful they would be in trouble, and that he knew the identity of companies that were already in trouble. Having taken this strong public position, Chairman

Dixon had an interest in seeing it sustained which might have clouded his judgment. It should also be noted that in *Texaco* there was a ruling that the findings of the Commission were not supported by substantial evidence.

The other case, American Cyanamid Co. v. F. T. C., 363 F.2d 757 (6th Cir. 1966), also involved Chairman Dixon. Prior to becoming a member of the Commission, Chairman Dixon had been counsel for a congressional subcommittee investigating certain business activities. While in this capacity, he wrote several letters and memoranda indicating vigorous feelings about certain violations that he concluded had been committed. It was held that under these circumstances he should not sit in judgment on the parties and issues which had been the subject of his investigations.

■ Against this background the Court concludes that the statement made by the Board prior to the hearing contested here, does not indicate the type of prejudgment which under the law should result in disqualification. Although there are many instances where the *Belsinger* case is referred to by the Board, with only one exception, Belsinger's conduct is described as "alleged." The exception appears in the minutes of a meeting of the Board, July 17, 1967:

> This meeting was held to discuss the possibility of suspending the license of Donald K. Belsinger.

> After a general discussion the Board unanimously voted to hold a Public Hearing as a result of the flagrant violations by Mr. Belsinger.

It is beyond dispute that the word "alleged" had been used, as it had been on other occasions when the violations were discussed. The totality of the picture presented, however, does not display a

---

4. American Cyanamid Co. v. F. T. C., 363 F.2d 757 (6th Cir. 1966).

5. Amos Treat & Co. v. S. E. C., 113 U.S. App.D.C. 100, 306 F.2d 260 (1962) citing Berkshire Employees Ass'n etc. v. N. L. R. B., 121 F.2d 235 (3rd Cir. 1941).

6. In re J. P. Linahan, Inc., 138 F.2d 650 (2d Cir. 1943).

7. U. S. ex rel. De Luca v. O'Rourke, 213 F.2d 759 (8th Cir. 1954).

8. Continental Box Co. v. N. L. R. B., 113 F.2d 93 (5th Cir. 1940).

9. Cf., National Lawyer's Guild v. Brownell, 126 F.Supp. 730 (D.C.D.C.1954).

predisposition immune to contrary evidence or persuasion. The remark complained of falls far short of the types of statements condemned in the decided cases, and is in fact more innocuous than some which were accepted.[10]

■ II. Plaintiff further complains that certain ex parte conversations between investigators and Board members were improper and voided the subsequent proceedings. The Court finds no merit in this claim. Administrative agencies frequently combine the investigative and adjudicative functions to some extent.[11] Although there is a line of cases standing for the proposition that a staff member who conducts an investigation cannot after elevation to the agency itself adjudicate the case,[12] this does not prohibit members of an administrative agency from being privy to investigative information for the purpose of determining whether the filing of a complaint charging violations of law or agency regulations is proper.[13] In a somewhat different context, this is what happened in F. T. C. v. Cement Institute, 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 (1948). There the Supreme Court held that an investigation by the Commission resulting in a report to Congress concluding that certain activity violated Antitrust laws, did not preclude the Commission from later deciding the same issue in an administrative proceeding. Admittedly the reports were made pursuant to congressional direction, but if the blending of functions violated due process, the direction would have been void. An agency such as the Electrical Board may, consistent with due process, review and discuss investigative reports for the purpose of determining whether a charge should be brought and a hearing held.

■ III. Plaintiff argues that the decision of the Board is unsupported by substantial evidence viewing the record as a whole. He asserts that there was no evidence from which the Board might infer that he either authorized, participated in or knew of the improper installations. In order to sustain plaintiff's position, two conclusions must be reached: (1) There was no evidence of knowledge, participation, or authorization, and (2) Such evidence was required to hold plaintiff personally liable.

The Court recognizes at the outset that no witness testified, nor was any evidence introduced to the effect that plaintiff actually sent his employees out with instructions to install the pumps and make the electrical connections. The Board, however, is as entitled to make reasonable inferences from circumstantial evidence. There is in the record evidence which would have justified the Board's finding that the acts punished were those in which plaintiff participated.

■ Moreover, even if we were to assume that plaintiff did not personally participate in or even know of these transgressions, he might still be held accountable. Plaintiff claims that although he held the title of President in Belsinger Maintenance Company, he was quite inactive in the day to day affairs. Rather, he devoted most of his energies to Belsinger Sign Company, a separate corporation which did the Electrical sign work for which Belsinger held his license. It is noted that both companies

---

10. Lumber Mut. Casualty Ins. Co. of New York v. Locke, 60 F.2d 35 (2d Cir. 1932) (statement by Commissioner that there was no need for a hearing since he knew all he needed to did not show that nothing would turn up at a hearing to change his mind).

11. See Pangburn v. C. A. B., 311 F.2d 349 (1st Cir. 1962).

12. E. g., Amos Treat & Co. v. S. E. C., 306 F.2d 260 (D.C.Cir. 1962).

13. "[T]he mere fact that agency members review investigative reports from staff workers in deciding whether or not to issue a complaint does not tend to disqualify such members from subsequently sitting as triers of fact when the case comes up for ultimate administrative disposition." Note, Prejudice and the Administrative Process, 59 N.W.L.R. 216 (1964). See also 5 U.S.C. § 554 (1967).

occupied the same address. It is beyond argument, however, that the president of a company must exercise some responsible supervision over operations. In fact, the record clearly indicates that plaintiff was kept informed of the affairs of Belsinger Maintenance. The president of a company is expected to be so informed.[14] This is particularly true where, as here, the president is warned of regulatory violations committed by company employees.[15] He then has the responsibility to protect against recurrences which indicate violations of the terms and conditions of the license held by him.

The offense here was not a criminal offense but a regulatory one. In regulatory offenses, the public interest outweighs the individual interest. Thus, for the sake of adequate public protection, it is necessary to hold the licensee to that standard of conduct which will assure that result.[16]

This principle has frequently been applied in the area of license revocation. As one court has said: "The licensee, if he elects to operate his business through employees, must be responsible to the licensing authority for their conduct in the exercise of his license * * *."[17] The test is not necessarily personal knowledge, but whether under the facts and circumstances of the case the licensee should in the exercise of reasonable supervision over the business have taken action to prevent the violation.[18] This responsibility rests upon the plaintiff through his dual role as licensee and corporate officer.

The Court finds no merit in plaintiff's assignments of error. Plaintiff had a full and fair hearing, from which evolved a decision based on substantial evidence

viewing the record as a whole. Therefore, defendant's motion for summary judgment will be granted and plaintiff's denied.

---

14. Davenport v. Prentice, 126 App.Div. 451, 110 N.Y.S. 1056 (1908).

15. Tr., p. 236.

16. Sayre, Criminal Responsibility for the Acts of Another, 23 Harv.L.Rev. 688, 720 (1930). Cf., United States v. Dotterweich, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943).

17. Mantzoros v. State Brd. of Equalization, 87 Cal.App.2d 140, 196 P.2d 657 (Cal.1948). See also, Nadorff Bros. v. City of Louisville, 144 Ky. 135, 137 S.W. 854 (Ky.1911).

18. Savoy Associates, Inc. v. Valentine, 266 App.Div. 63, 41 N.Y.S.2d 3 (1943).