**Donald K. BELSINGER, Appellant,**

v.

**DISTRICT OF COLUMBIA et al.**

**No. 22880.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 24, 1970.

Decided June 29, 1970.

Mr. Robert M. Goolrick, Washington, D. C., with whom Mr. Robert D. Wallick, Washington, D. C., was on the brief, for appellant.

Mr. David P. Sutton, Asst. Corporation Counsel for the District of Columbia, with whom Messrs. Charles T. Duncan, Corporation Counsel at the time the brief was filed, Hubert B. Pair, Acting Corporation Counsel, and Richard W. Barton, Asst. Corporation Counsel, were on the brief, for appellees.

Before TAMM, LEVENTHAL and WILKEY, Circuit Judges.

WILKEY, Circuit Judge:

This appeal arises from an administrative proceeding by the Electrical Board of the District of Columbia con-

cerning the installation and electrical connection of approximately 40 gasoline pumps at Sunoco stations. In many instances the electrical connections were made by non-licensed personnel and without the required electrical permits being obtained. After a hearing the Electrical Board suspended the master electrician specialist license of the appellant, Donald K. Belsinger, for a period of one year. Thereafter the appellant sought both temporary and permanent injunctions in the United States District Court against the operation of the order of the Electrical Board. The temporary injunction was granted pending disposition of the case, but thereafter summary judgment was entered in favor of the Electrical Board, whose order has been stayed pending the outcome of this appeal.

## I. *Facts*

Belsinger Maintenance Corporation, of which appellant Belsinger is president and 20 percent stockholder, installs, maintains, and services equipment at gasoline station sites. The Maintenance Corporation owns a fleet of trucks, appropriate tools, employs 14 to 20 men, and has contracts from several major oil companies. It is not licensed to do electrical work and does not hold itself out as an electrical contractor. The vice-president and general manager of the Maintenance Corporation is one John Dirzuweit, who has charge of all day to day operations.

The appellant Belsinger is also president and a stockholder of Belsinger Signs, Inc., in which he functions as general manager, a task which consumes approximately 90 percent of his time. Appellant individually has a master electrician specialist license, limited to signs and cathode lighting, and he is the only one connected with Belsinger Signs, Inc., who has such a license. The Sign Company has special electrical contractor's license No. 183 in the District of Columbia, also limited to signs and cathode lighting.

In December 1966 Dirzuweit entered into an oral contract with the Sun Oil Company for the installation of approximately 40 gasoline pumps in the Washington area, at a charge of $50.00 per pump, plus the cost of the required permits. This was a routine contract in the usual course of the Maintenance Corporation's business, totalling no more than $2,500; appellant Belsinger had no knowledge of this at the time, although he was informed of it later.

In January 1967 appellant approached Walter G. Kolb, president of Kolb Electric Company, a licensed master electrician and former member of the Electrical Board of the District of Columbia, in regard to making the electrical connections required on the Sunoco pump installations contracted for by the Maintenance Corporation. It was agreed that Kolb Electric would obtain the necessary permits, but that Dirzuweit was to draw up the applications. Kolb Electric received them shortly after February 10, 1967. On the electrical permit application forms Kolb Electric, a licensed specialist in electrical work, was designated as applicant, while on the fire marshal permit application forms Belsinger Maintenance was designated as the applicant.

The testimony is somewhat conflicting as to the personal involvement, if any, of appellant Belsinger after the agreement was reached between him and Walter G. Kolb for Kolb Electric to do the electrical work. Belsinger claims that the matter was carried on thereafter entirely by Dirzuweit. Kolb's son, secretary of Kolb Electric, claims that he "may have seen" Belsinger once or twice and "maybe" called the appellant Belsinger personally five or six times, but on some occasions was referred to Dirzuweit as the general manager of the Maintenance Corporation. There is no dispute that arrangements as to notification when the pumps were ready to be hooked up were made between Dirzuweit and Kolb.

The evidence also conflicts as to whether Kolb Electric was diligent in performing its contract, and whether its

lack of diligence in responding to notification from the Maintenance Corporation that the electrical connections were ready to be made inspired the employees of the latter to do this work on their own in order to complete the job for Sunoco.[1]

It is clear from various testimony, however, for whatever the reasons, that the Maintenance Corporation employees, though not licensed to do so, did make numerous electrical connections at various Sunoco stations, and that in many instances these connections were made before any electrical permits were issued —something which no one had any right to do. These violations came to the attention of the District of Columbia Electrical Board.

## II. *Findings, Conclusions, and Board Action*

Against this factual backdrop we should ordinarily have expected that the scene on appeal would present us with questions concerning the propriety of injunctive action or even criminal prosecution taken by the Board against Belsinger Maintenance Corporation, and perhaps against the individual employees thereof who had performed or authorized the unlicensed electrical work.

Not so.

The Electrical Board has neither taken action against Belsinger Maintenance Corporation nor against any of its employees—except against its president Donald K. Belsinger personally. What the Electrical Board *has* done is to suspend for one year the master electrical specialist license of Donald K. Belsinger, which is limited to "neon and electrical signs and cold-cathode lighting." This

has the effect of also suspending the special electrical contractor's license of the corporation, Belsinger Signs, Inc., which is dependent on Belsinger's personal master electrician specialist license. Neither the master electrician specialist license of appellant Belsinger nor the business carried on by Belsinger Signs, Inc. has anything to do with the installation of gasoline pumps or the electrical connections pertaining thereto.

The installation of gasoline pumps is classified by the National Electrical Code as "the highest hazard * * * in the Electrical field, because it involves places where * * * [there are] gas fumes." The public interest in adequate protection by prohibiting unlicensed personnel from making such electrical connections is clear, as the District Court held. Revocation and suspension of any license involved, where the licensee has violated his obligations by directing or authorizing the actions of unlicensed or unskilled personnel in making such dangerous installations, is a proper disciplinary action for the Electrical Board to take.[2]

But the public interest we are concerned with here is the protection of the public from gas fumes being ignited by faulty electrical wiring. The Electrical Board has taken no action whatsoever against the employees of the Maintenance Corporation who made such installation, nor against the Maintenance Corporation itself. For all this record shows, the Maintenance Corporation and the persons doing the unauthorized acts are perfectly free to continue the same.

Some persons in the District of Columbia may sleep easier at night for knowing that for any unauthorized gaso-

---

1. The electrical connection of the pumps was a minor portion of the overall work involved.

2. Part II of Reorganization Order No. 59, pertaining to the purposes of establishing boards such as the Electrical Board, reads in relevant part:
   [T]he Department of Occupations and Professions is established * * * in

order to protect the public from incompetent and unfair practices * * *.
Part III of the same Order, pertaining to the powers of such boards, reads in relevant part:

Each of the aforementioned boards is vested with * * * the power and authority * * * to grant, suspend, and revoke licenses and registrations. * * *

line pump electrical connections made the ever alert Electrical Board will revoke some licensee's permit to install "neon and electric signs and cold cathode lighting," and effectively suspend some sign company's authority to do business in the District of Columbia, but to our minds the Electrical Board's action here brings no such comfort.

■ There is no finding that appellant Belsinger, either individually or through Belsinger Signs, Inc., attempted to act under the guise of his personal master electrician specialist license, or through Belsinger Signs, Inc.'s special electrical contractor's license. The evidence is to the contrary.[3] After appellant Belsinger heard of the contract obtained by the Maintenance Corporation, presumably recognizing that it had no authority to make the necessary electrical connections, the appellant contacted Kolb Electric Company, a licensed electrical contractor in this field, to make these electrical connections. Walter G. Belsinger first attempted to persuade him to "shop * * * [his] license" prior to agreeing to have Kolb employees make the required electrical connections. But even taking this version as true, the result we reach in this case is unchanged for two reasons:

(1) The fact remains that an agreement *was* made to have Kolb employees do the work, and there is no testimony indicating that the agreement was a sham; and

(2) As is developed in considerably more detail later in this opinion, the unlawful acts of the Maintenance Corporation employees—who performed mechanical work *only* in their assigned duties —bore no relationship to the activities of the Sign Company, which depended upon the suspended license for its continued operation, nor to Belsinger's activities in regard thereto.

So, when the Board sought to exercise its particular power to "suspend and revoke" electrical licenses, it did have jurisdiction over the Sign Company (and its officers), but had no jurisdiction over the Maintenance Corporation (and its officers). But there is no finding (nor evidence) that a single employee of Belsinger Signs, Inc. ever did any work at a gasoline station. The confusion of the Electrical Board in exercising its jurisdiction over the parties here is illustrated by reference to the Findings of Fact and Conclusions of Law.

■ The first finding of fact sets up the occupational license of appellant Belsinger as limited to "neon and electric signs and cold cathode lighting." The third finding of fact further established "thereafter the said Belsinger, *through his employees*, did install at various Sunoco stations in the District of Columbia approximately 38 gasoline pumps, which installation included the electrical connection of the pumps." (Emphasis added). There is no evidence whatsoever that appellant Belsinger personally had any employees; therefore the reference to "his employees" is clearly in error. If finding of fact No. 3 be amended to state "through its employees", the only evidence supporting such a finding is that employees of the Maintenance Corporation did the electrical connecting work complained of.

The conclusions of law recite that "Donald K. Belsinger did * * * perform" and "did * * * install" and "did * * * engage in the business of an electrical contractor." These conclusions of law must rest on finding of fact No. 3, which says that Belsinger acted "through his [its] employees." The resulting order suspends the appellant Belsinger from acting as a master electrician specialist, the license for which is limited to neon and electric signs and cold cathode lighting, effectively curtailing the operations of Belsinger Signs, Inc., the officers and employees of which had no part in the offenses considered by the Board.

---

3. The point was conceded by the Electrical Board at oral argument.

## III. *Personal and Corporate Responsibility of Licensee*

While the Electrical Board does not draw a clear distinction between the responsibility of Belsinger based on his personal knowledge and activity, and the responsibility of appellant based on his position as president of Belsinger Maintenance Corporation, we point out for the guidance of the Board in future cases that there is a distinction. Furthermore, this distinction determines the type of remedy the Board properly could seek, and against whom.

If it were found by the Board to be a fact that the appellant held himself out as having the required qualifications, and personally directed or authorized anyone—whether employee of Belsinger Maintenance Corporation or Belsinger Signs, Inc.—to make electrical connections at the Sunoco service stations, it could plausibly be argued that the appellant himself was really acting in excess of his limited master electrician specialist license. With proof of appellant's personal direction or authorization, the illicit electrical connections would be related to appellant's limited electrical license, and suspension thereof would be a proper remedy.

But here the record, contrary to the apparent conclusion of the District Judge, does not support such a finding. The appellant himself vigorously denies any such representation, direction, or even knowledge. His action in making the agreement with Kolb Electric intrinsically contradicts any intent on Belsinger's part to utilize his own limited master electrician license. The only evidence tending to impute knowledge to the appellant of the progress of the Sunoco pump installation contract is the testimony of the Secretary of Kolb Electric that he called Belsinger. However, the same witness testified that he was sometimes referred to Dirzuweit, the vice-president and general manager of the Maintenance Corporation, and he made the detailed arrangements with Dirzuweit. Moreover, there is no claim that in any of these conversations appellant was informed that Maintenance Corporation employees were making the electrical connections.[4] In fact, if he had received any such intimation from Kolb Electric, since he himself had made the agreement with Kolb for the perform-

---

4. This case is thus to be distinguished from Am-Chi Restaurant, Inc. v. Simonson, 130 U.S.App.D.C. 37, 38, 396 F.2d 686, 687 (1968), when we said:

"We have no occasion to consider whether a suspension or revocation could be sustained if the record were totally devoid of circumstances implicating the licensee, on a theory utilized in some jurisdictions of absolute liability or imputed liability for the fault of an employee even though the licensee had no reason or basis for supposing that such fault might exist."

This case is also to be distinguished from those cases relied upon by the District Court, which dealt with revocation of the principal's license to practice in the field in which his agent's violations occurred. In Mantzoros v. State Brd. of Equalization, 87 Cal.App.2d 140, 196 P.2d 657 (1948), a liquor licensee, operating his business through employees, was held subject to the discipline of the licensing authority for the misconduct of the employees *in exercising the license*; in Nadorff Bros. v. City of Louisville, 144 Ky. 135, 137 S.W. 854 (1911), the liquor license of the proprietors of a bar was revoked because their barkeeper unbeknownst to them, made sales on Sunday *at the licensed premises*; and in Savoy Associates, Inc. v. Valentine, 266 App.Div. 63, 41 N.Y.S.2d 3 (1943), the public dance hall license of Savoy Associates was revoked because disorderly or immoral conduct was permitted *on the licensed premises*.

Similarly, although in *Am-Chi* employer and employee were not ostensibly practicing in the same field, we indicated the undeniable necessary close linkage:

Appellant was running a business fraught with possibility for prostitution. * * * It is enough that the employee's regular duties required verbal intercourse with unattached patrons, * * * (citing other linking factors) * * * if indeed the high liquor prices did not affirmatively reflect the special convenience of the site as a dual market place. 130 U.S.App. D.C. at 39, 396 F.2d at 688.

ance of this work, Belsinger would probably have acted to force Kolb Electric to carry out its contract. Of any such action by appellant Belsinger the record is silent.

■ On an alternative theory, if the Board is seeking to penalize appellant Belsinger based on his position as president of the Maintenance Corporation, it must prove that he either knew or should have known of the forbidden and dangerous work being done by employees of the Maintenance Corporation, and took no action to stop it.[5] We find that the Board has not sustained this burden.

In Am-Chi Restaurant, Inc. v. Simonson[6] the forbidden offensive actions (soliciting for prostitution) grew out of the business (sale of liquor) which the licensee was licensed to conduct and occurred on his premises. Hence the licensee was held to be properly chargeable with responsibility, even though he testified he had no personal notice, and the suspension of his license was upheld by this court. Here the forbidden offensive actions (making electrical connections at gasoline pumps) did *not* grow out of the business (electrical signs and lighting) which the licensee Belsinger was licensed to conduct. Those actions grew out of the business of the Maintenance Corporation, which has no electrical license.

And while it is arguable that because of the two small corporations sharing offices, appellant Belsinger by osmosis ought to have been aware of what the Maintenance Corporation employees were doing out on the job, there is no proper finding to this effect, nor does the record support such a conclusion. The Maintenance Corporation has a vice-president and general manager, Dirzuweit, who made the original contract with Sunoco and whose duties were to conduct the day to day operations of the Maintenance Corporation. It is not enough to simply label appellant as the president of the Maintenance Corporation, without either showing personal knowledge or an obligation arising from his normal official duties to have known of the specific actions complained of. This contract was for no more than twenty-five hundred dollars ($2,500.00), the electrical connections were a small part of it, and there is no reason to infer from the description of appellant's principal duties with the Sign Company and his positions with the other related corporations, that in the exercise of his normal responsibilities as president of the Maintenance Corporation, he would necessarily have become aware of any of the facts made the basis of his license revocation.[7]

If the basis for the Board's action against appellant rests on his failure properly to discharge his responsibilities as president of the Maintenance Corporation, then the penalty of revocation of a personal electrical license unrelated to the business of the Maintenance Corporation is unjustified and cannot stand. The Board could have sought injunctive

---

5. U. S. v. Dotterweich, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943).

6. 130 U.S.App.D.C. 37, 396 F.2d 686 (1968).

7. The Board argues that both the Maintenance Corporation and the Sign Company were located at the same offices in the District of Columbia, and therefore their corporate activities were inextricably mixed. But the appellant is a resident of Baltimore, and has responsibilities with other corporations located in Baltimore such as treasurer of Belsinger Sign Works, Inc., vice-president of Belsinger Paint and Hardware Corporation, vice-president of Belsinger

Fleet Systems, Inc., stockholder and director of Scientific Research, Inc., and stockholder and director of Woodward Manufacturing Company. Given the unequivocal testimony of both appellant and Dirzuweit as to appellant running the Sign Company and Dirzuweit the Maintenance Corporation, it is difficult to hold the direct contrary.

Incidentally, there is no showing that the stockholders of the two corporations are the same; the Board's action thus penalizes not only appellant but stockholders of the Sign Company, none of whose employees is alleged to have participated in any violation.

action, or perhaps even criminal penalties if authorized, against the Maintenance Corporation and its employees actively participating in the violations, including appellant Belsinger himself if the facts established his responsibility as president of the Maintenance Corporation.

On oral argument the Electrical Board sought to attach personal responsibility to appellant Belsinger by theorizing that its action was "piercing the corporate veil." But a moment's reflection shows that if, indeed, this was the basis for the Board's action, the *wrong* corporate veil was pierced. *Hamlet* illustrates the danger of piercing curtains. At least Shakespeare's character had the right curtain, although he stabbed the wrong man; here the Electrical Board, while sure in its own mind of its mark, pierced the wrong veil and invoked the wrong remedy against the wrong victim.

The record makes it clear that the Maintenance Corporation performs strictly mechanical functions in its normal operations, and is not dependent upon a license from the Electrical Board for its continued existence. At the hearing, the Board sought to exercise its power "to suspend and revoke licenses". Accordingly, the only corporate veil which could have been pierced was that of Belsinger Signs, Inc., the operations of which are directly dependent upon the continued existence of Belsinger's electrician specialist permit.

Judging from the record in this case, this is merely illustrative of the confusion from the beginning as to what the Board was doing, why, where, and to whom. If the Electrical Board's order of suspension stands, the citizens of the District of Columbia will be deprived of the services and the competition offered by Belsinger Signs, Inc. for one year, while Belsinger Maintenance Corporation is left unrestricted to carry on installing gasoline pumps and electrical connections too, in whatever manner it has done in the past.

## IV. *Conclusion*

We have gone into the detail of this case involving municipal licensing authority to illustrate the haphazard results which are achieved when an occupational specialist licensing board functions apparently unguided by legal counsel, except perhaps by sporadic review by the Corporation Counsel of the District of Columbia. The Electrical Board demonstrated zeal, but not commendable zeal, in its effort to punish someone connected with Belsinger Maintenance Corporation for what were admittedly unauthorized and illegal acts of its employees. In its misplaced zeal the Board wound up imposing a penalty against an individual who, at least on the record established, was not responsible for the acts complained of, and on a separate company which it is not even contended had any connection with the illegal acts, while the demonstrated miscreants go scot free. Surely counsel would have directed the Board's original complaint in a different channel.

Reversed and remanded to the District Court for entry of the appropriate order in accordance with this opinion.

LEVENTHAL, Circuit Judge (concurring):

I concur in the opinion of Judge Wilkey, directed as it is to the record before us, shaped by the findings of the board.

I wish to add my observation that this is not inconsistent with the possibility that suspension might have been sustainable, even on the evidence actually presented, if the board had proceeded on a different theory, giving notice of that theory to the appellant, and had carefully presented supporting findings.

For example, counsel representing the board in court laid stress on the reasonableness of inferences that might legitimately be drawn from the close relationship between the sign and maintenance companies, in terms of physical proximity and their interlocking presidency. Such considerations, reinforced by the

doctrine permitting the burden of coming forward with evidence on a particular point to be placed on the party having better access to the facts, might well have allowed the board to conclude, absent proof to the contrary, that the maintenance company's proceeding with the electrical work on its own was ascribable in realistic measure to Belsinger's belief that his master electrician specialist license, while not giving him the legal right to have his maintenance company perform work beyond its scope, made that company's action only a minor and not a major transgression. That Belsinger believed himself capable of the pump work was inferable from Kolb's testimony.

If the board had proceeded on such a theory, with due notice to Belsinger so that he could have been alerted to adduce whatever evidence there was to the contrary, there might well have been available a reasonable assumption of a connection between the license and the illegal installation.

To put it crisply, the board could have found that it was unlikely that the maintenance company would have undertaken even simple electrical work if it had not had available an official with a respectable electrician's license. With such a connection, suspension in the public interest might have been justified.

The board's appellate counsel tried to impart this gloss to the case, but of course subsequent rationalizations of counsel cannot take the place of findings made concurrently with the order.[1]

All this underscores the importance of Judge Wilkey's observations regarding the need for various local agencies, previously used to informal procedures, to obtain the advice of trained counsel before they chart their course. The need for reflective findings conjoins with the need for articulated standards, assuring evenhanded application of the law,[2] rather than whim or misplaced zeal. This need has if anything been accentuated by the District of Columbia Administrative Procedure Act, D.C.Code §§ 1–1501 —1–1510 (Supp. III, 1970).

---

1. NLRB v. Metropolitan Life Ins. Co., 380 U.S. 438, 443–444, 85 S.Ct. 1061, 13 L.Ed.2d 951 (1965); Braniff Airways, Inc. v. CAB, 126 U.S.App.D.C. 399, 411, 379 F.2d 453, 465 (1967); National Air Carriers Assn. v. CAB, No. 23,012, 141 U.S.App.D.C. ——, at ——, 436 F.2d 185, at 195 (May 28, 1970).

2. Am-Chi Restaurant, Inc. v. Simonson, 130 U.S.App.D.C. 37, 38, 396 F.2d 686, 687 (1968).