**ENVIRONMENTAL DEFENSE FUND, INC., et al., Petitioners,**

**v.**

**MAYOR–COMMISSIONER OF the DISTRICT OF COLUMBIA et al., Respondents.**

**No. 6707.**

District of Columbia Court of Appeals.

Argued Jan. 30, 1973.

Decided March 27, 1974.

---

Scott H. Lang, Washington, D. C., with whom John F. Dienelt, Washington, D. C., was on the brief, for petitioners.

James N. Dulcan, Asst. Corp. Counsel, Washington, D. C., with whom C. Francis Murphy, Corp. Counsel, and Richard W. Barton, Asst. Corp. Counsel, Washington, D. C., were on the brief, for respondents.

Before REILLY, Chief Judge, PAIR and YEAGLEY, Associate Judges.

PAIR, Associate Judge:

This court is petitioned to review administrative inaction with respect to environmental protection. Petitioners,[1] the Environmental Defense Fund, Inc. (EDF), are engaged in activities relating to environmental protection. Contending that a "chronic" air pollution emergency[2] existed in the District of Columbia, petitioners requested the Mayor-Commissioner and his designated agents, the Director of the Department of Environmental Services and the Director of the Department of Highways and Traffic (respondents), to take immediate steps to correct by appropriate action the condition complained of. The specific request was for the declaration[3] of an "Emergency Episode."[4] Respondents failed to accede to the request and this petition for review followed. Respondents moved to dismiss the petition urging that this court is without jurisdiction because there existed no "contested case"[5] within the purview of the District of Columbia Administrative Procedure Act (D.C.APA).[6]

Upon consideration of the motion and opposition thereto, we deferred ruling on the motion pending argument on the merits. We now grant the motion.

In their petition for review, EDF relied first upon D.C.Code 1967, § 11–742(a)(11) (Supp. III, 1970), which at that time provided:

. . . [T]he District of Columbia Court of Appeals has exclusive jurisdiction to review . . . :

(11) any agency action taken by the Commissioner of the District of Columbia or the District of Columbia Council under the District of Columbia Air Pollution Control Act.[7]

This provision was repealed by the District of Columbia Court Reform and Criminal Procedure Act of 1970,[8] which completely revised Title 11 of the District of Columbia Code. The jurisdiction of this court is now controlled by D.C.Code 1973, § 11–722, which provides:

The District of Columbia Court of Appeals has jurisdiction . . . to review orders and decisions of the Commissioner of the District of Columbia . . . in accordance with the District of Columbia Administrative Procedure Act (D.C.Code, secs. 1–1501–1–1510) . . . .

Insofar as here pertinent, the D.C.APA provides:

Any person suffering a legal wrong, or adversely affected or aggrieved, by an order or decision of the Commissioner or Council or an agency in a *contested case*, is entitled to a judicial review thereof in accordance with this chapter upon filing in the District of Columbia Court of Appeals a written petition for review. . . . [Emphasis added; D.C.Code 1973, § 1–1510.]

---

1. The petitioners in this case are eight organizations and one individual.

2. *See* 8 D.C.R.R. 2:719.

3. 8 D.C.R.R. 2:719(a)(2).

4. 8 D.C.R.R. 2:702.

5. D.C.Code 1973, § 1–1502(8)

6. D.C.Code 1973, § 1–1501 et seq.

7. D.C.Code 1973, § 6–811 et seq.

8. Pub.L.No.91–358, Title 1, § 111 (July 29, 1970), 84 Stat. 481.

The term "contested case" is defined as

. . . a proceeding before the Commissioner, the Council, or any agency *in which the legal rights, duties, or privileges of specific parties are required by any law* (other than this chapter), or by constitutional right, *to be determined after a hearing* before the Commissioner or the Council or before an agency, *but shall not include* (A) any matter subject to a subsequent trial of the law and the facts de novo in any court . . . [or] (C) *proceedings in which decisions rest solely on* inspections, *tests,* or elections . . . . [Emphasis added; D. C.Code 1973, § 1–1502(8).]

In Citizens Ass'n of Georgetown, Inc. v. Washington, D.C.App., 291 A.2d 699, 703 (1972), this court was petitioned to compel the Zoning Commission to consider amendments to the zoning classifications of the Georgetown Waterfront area. Holding that the court lacked jurisdiction to review because no order or decision had been entered in a contested case, we pointed out that:

The principal manifestation of a "contested case" is its character as a quasi-judicial process based upon particular facts and information, and immediately affecting the interests of specific parties in the proceeding. . . .

We pointed out further that:

In a proceeding involving the interim amendments proposed by petitioner, the Zoning Commission must play a role beyond resolution of the legal rights of specific parties. . . . The Zoning Commission's evaluation of the area would not rest upon the status of any particular property, nor would the peculiar problems of any one individual in the area be of paramount concern. It is difficult to conceive that factual findings would be required on the particular status of specific individuals. . . . [*Id.* at 704–705.]

■ Thus it is clear that the D.C.APA has limited judicial review by this court to orders or decisions of a District of Columbia agency made "after a hearing before the Commissioner or the Council or before an agency" in a "contested case."[9] Petitioners do not contend that any such proceeding was conducted in the instant case; rather, they assert on the authority of Environmental Defense Fund, Inc. v. Hardin, 138 U.S.App.D.C. 391, 428 F.2d 1093 (1970) (EDF v. Hardin), that since the subject of their complaint is the inaction of the respondents, they are entitled to judicial review even though there has been no final order or decision. There are several flaws in this argument. Complained of in EDF v. Hardin, *supra,* was the failure of a federal agency to take action to enforce a federal statute,[10] and judicial review[11] was accorded pursuant to the Federal Administrative Procedure Act (APA).[12]

■ The Federal APA, however, does not apply to the District of Columbia,[13] and therefore cannot control judicial review[14] by this court of either action or inaction of a District of Columbia administrative agency. Further, any construction given to the statute involved in *Hardin,* however authoritative, can have little, if any, precedential value in respect to our construction of a statute of purely local application.[15] The reason for this is that the D.C.APA was

9. D.C.Code 1973, § 1–1502(8). See Capitol Hill Restoration Soc. v. Zoning Commission, D.C.App., 287 A.2d 101 (1972).

10. 7 U.S.C. § 135 (1964).

11. 5 U.S.C. § 701 et seq. (1966).

12. 5 U.S.C. § 500 et seq. (1967).

13. *See* 5 U.S.C. § 551(1)(D) (1966). *See also* Belsinger v. District of Columbia, 295 F.Supp. 159, 161 (D.C.1969), reversed on other grounds, 141 U.S.App.D.C. 60, 436 F. 2d 214 (1970).

14. *See* 5 U.S.C. § 701(b)(1)(D) (1966).

15. *Compare* Paul v. United States, D.C.App., 301 A.2d 226 (1973).

based upon the model act for administrative procedures in the States, ⟨ ⟩o ed by the National Conference of Commissioners on Uniform State Laws. However, it has been modified and adjusted by the Administrative Law Committee of the District of Columbia Bar Association, and by subcommittees of your committee, to embrace the functions of the District, which operates sometimes as a State, sometimes as a city, sometimes as both. Obviously, all the provisions of the usual model State Administrative Procedure Act may not successfully be applied literally to the varied operations of the many different administrative agencies in the District of Columbia. Hence, the model act has been revised in many respects to meet local conditions, so the reported bill is well developed and provides a comprehensive District of Columbia Administrative Procedure Act.[16]

The statute does, however, contemplate standards of judicial review similar to those found in the federal APA,[17] but only in "contested cases" as defined by statute. *See* Matala v. Washington, D.C.App., 276 A.2d 126 (1971).

The legislative history clearly reflects the correctness of *Matala, supra*:

The District of Columbia Court of Appeals is the local District of Columbia court of . . . appellate jurisdiction. That court already reviews the actions of a number of local government agencies. It is a local tribunal attuned to the review of local government action. In the committee's judgment, this is the

proper tribunal before which administrative decisions of local government agencies *in contested cases* should be reviewable. . . .[18]

The bill establishes definite safeguards and procedural rules respecting "contested cases," as defined in the bill. A "contested case" means a proceeding in which the legal rights, duties, or privileges of specific parties are required by any law (other than this act), or by constitutional right, to be determined after a hearing. Matters subject to subsequent trial of the law and the facts de novo in any court are excluded from the definition, as are the selection or tenure of an officer or employee of the District, proceedings in which decisions rest solely on inspections, tests, or elections, and cases in which the Commissioner, Council, or an agency acts as an agent of a court of the District.

The bill itself *affords no right to a hearing,* but where such right exists it requires that the parties receive full and timely notice, and that they be afforded the opportunity to present evidence and argument.[19]   [Emphasis added.]

We conclude therefore that petitioner's reliance upon EDF v. Hardin, *supra,* is misplaced. In summation, we hold that where, as here, the substantive statute does not provide for a hearing,[20] and no record in a contested case in which there has been a final order or decision for the purposes of the D.C.APA is brought to this court for review, the petitioner's remedy, if any, lies outside of the D.C.APA. Because the conditions precedent to the proper invoca-

---

16. H.R.Rep.No.202, 90th Cong., 1st Sess. 4–5 (1967). *Accord,* S.Rep.No.1581, 90th Cong., 2nd Sess. 2 (1968).

17. *See* Woodridge Nursery School v. Jessup, D.C.App., 269 A.2d 199 (1970).

18. S.Rep.No.1581, 90th Cong., 2nd Sess. 6 (1968).

19. S.Rep.No.1581, *supra* note 18, at 6.

20. Thus, there is a clear distinction between this case and a case involving, for instance, review of a wage order. With respect to such

an order, the Organic Act, D.C.Code 1973, § 36–401 et seq., specifically requires review by this court on petition of any person aggrieved thereby. *See* D.C.Code 1973, § 36–409(a). *See also* H.R.Rep.No.907, 91st Cong., 2d Sess. 165 (1970). In sharp contrast, the statute involved in this case, D.C. Code 1973, § 6–811 et seq., contains no such provision for review. Thus, our jurisdiction in this area is limited to review of "contested cases." *See* D.C.Code 1973, § 1–1501 et seq.

tion of this court's jurisdiction have not been satisfied, the petition for review must be, and is hereby,

Dismissed.

REILLY, Chief Judge (concurring):

Although I concur with the order of dismissal, I have great difficulty with the premise that the wording of the District of Columbia Administrative Procedure Act precludes this court from considering on its merits petitioners' prayer for relief. In elaborating upon the definition of a "contested case" and concluding that the case before us does not fall into that category, the majority opinion overlooks two crucial sentences in Section 11 of that Act [1] which, insofar as relevant, read:

. . . In all other cases the review by the court of administrative orders and decisions shall be in accordance with the rules of law which define the scope and limitations of review of administrative proceedings. Such rules shall include, but not be limited to, the power of the court—

. . . .

(2) to compel agency action unlawfully withheld or unreasonably delayed;

. . . .

Once it is conceded that petitioners have standing to sue—a concession which I suppose we are compelled to make in light of such decisions as Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L. Ed.2d 184 (1970), and Scenic Hudson Preservation Conference v. Federal Power Commission, 354 F.2d 608 (2d Cir. 1965), cert. denied, 407 U.S. 926, 92 S.Ct. 2453, 32 L.Ed.2d 813 (1972),[2] which seem to hold that a person described in 5 U.S.C. § 702

"adversely affected or aggrieved" [3] by agency action includes private organizations acting as self-appointed attorneys general—the real question before us is whether the inaction they complain of was "agency action unlawfully withheld or unreasonably delayed". We cannot avoid this issue by stating that since no hearing was either held or required under the Air Pollution Act, this court lacks jurisdiction because of the restrictive definition in Section 3(8) [§ 1–1502(8)] of the local Administrative Procedure Act. As I have pointed out, the subsection upon which petitioners' statutory cause of action is founded, rests upon an unrelated provision of that act.

Thus, I would not distinguish Environmental Defense Fund, Inc. v. Hardin, 138 U.S.App.D.C. 391, 428 F.2d 1093 (1970), on the ground that such case arose under the Federal Administrative Procedure Act rather than the corresponding statute for the District, as the words in both enactments applicable to this case are identical. In each instance, the inaction of the administrative official—in the *Hardin* case, the Secretary of Agriculture; in this case, the Commissioner—was with respect to a matter committed solely to his discretion by the substantive statute. Nor can the cases be distinguished on the ground that in *Hardin* a preliminary administrative hearing had already been held.

It is well settled in this jurisdiction that a claim of unlawful or unreasonable delay establishes court jurisdiction to grant such relief as a decree requiring the agency to conduct a hearing.[4]

Accordingly it seems to me that we should face the issue raised by the petition. If we do so, it is plain that in the case before us, unlike *Hardin*, there has been no

1. D.C.Code 1973, § 1–1510.

2. *See also* digest of cases collected in 11 A.L.R.Fed. 556 under caption "Environmental Protection Suit—Standing".

3. Identical language appears in the local A.P.A., § 1–1510.

4. International Ass'n of Mach. & A. Wkrs. v. National Med. Bd., 138 U.S.App.D.C. 96, 425 F.2d 527 (1970); Kessler v. F.C.C., 117 U.S. App.D.C. 130, 141, 326 F.2d 673, 684 (1963); Harvey Radio Laboratories, Inc. v. United States, 110 U.S.App.D.C. 81, 289 F.2d 458 (1961).

showing of unlawful or unreasonable delay and therefore the petition should be dismissed.

What petitioners complain of is the failure of the Commissioner to establish "procedures . . . to effectively deal with an air pollution emergency"—authority conferred on him by a provision of the District of Columbia Air Pollution Act, D. C.Code 1973, § 6–813(a)(3), subject to regulations of the District Council. According to petitioners, such procedures could pave the way for drastically limiting the use of private motor cars in this jurisdiction, thus forcing commuters to avail themselves of public transportation services which, as of this date, lack facilities to handle more than an insignificant fragment of the traffic load.

As it is obvious that the only reason for the creation of the District of Columbia was to provide a place for the branches of the Federal government to operate, and equally obvious that the bulk of employees in the executive and legislative branches now rely upon privately owned automobiles to commute to their offices, any action by a District official which would disrupt this pattern and thus impede the functioning of government itself should be undertaken only under circumstances which pose direct danger to public health and safety. Such action would demand the closest judicial scrutiny.

Petitioners' thesis is that "air pollution emergencies" occur daily in the District of Columbia and that the principal cause of these "emergencies" is automobile traffic. In explaining this thesis, petitioners point to tests at selected busy traffic intersections—taken in summer—which show that on certain days some of these sites had concentrations of "35 ppm [for carbon monoxide]"—a few as high as 50 ppm— from which samplings, they argue a degree of air pollution in the District dangerous to public health and safety.

To characterize these phenomena, as petitioners do, as constituting either an emergency or a degree of air pollution dangerous to public health is to indulge in the grossest exaggeration. What the term 50 ppm really means is 50 parts per million. To put the matter into perspective, it is not until the carbon monoxide level reaches 1200 parts per million—a figure 24 times greater than the worst air pocket cited— that it has a fatal effect upon human beings.[5] Yet petitioners tell us that experts in the Environmental Protection Agency have determined that an urban level in excess of 35 ppm is contrary to the standards they propose to set under the Air Pollution Act.

Not even petitioners contend that the air pockets they have monitored in rush traffic hours are typical of ambient air conditions throughout the city. Obviously these pockets are being continuously dissipated by wind and other atmospheric changes. But in an effort to give their discoveries some ominous significance, petitioners included in the record a publication of the Environmental Health Service entitled "Air Quality Criteria for Carbon Monoxide." This "study" replete with medical and chemical terms—to say nothing of algebraic formulae—is not easy reading but it unconsciously reveals the lack of any factual basis for alarm. It declares at one point that studies of human exposure to presumably dangerous monoxide levels (i. e., 35 ppm) ". . . has led to 80 percent of the equilibrium value of 5 percent COHb being approached in 4 hours, and the remaining 20 percent approached slowly over the next 8 hours." This observation may not be intelligible to the casual reader. But if he plows on, he learns on the next page that ". . . cigarette smokers generally have a COHb with a median value of 5 percent . . . ." In other words, stripped of pseudoscientific jargon, what the authors seem to assert is that if a nonsmoker for twelve hours breathed nothing but the kind

5. Grayson & Shepard, The Disaster Lobby: Prophets of Ecological Doom and Other Absurdities, 1973.

of air found in one of the cited heavy traffic pockets, he would have as much carbon monoxide in his blood as the average cigarette smoker.

Whatever the truth of the legend that only "mad dogs and Englishmen go out in the noonday sun," it would be surprising to find that any significant number of residents of this area would stand for eight hours or more on a summer day in close proximity to one of these busy intersections where petitioners have detected "dangerous" pockets of carbon monoxide. But if indeed there are some, it appears that the worst that can happen to those hardy individuals is to share momentarily the same impairment to breathing and reflex actions that already besets the millions and millions of Americans whose liking for cigarettes has not been shaken by the well advertised admonitions of the Surgeon General.

With all deference to the zeal of clean air enthusiasts, I respectfully suggest that the proper disposition of this case would be to hold that far from being "unlawful" or "unreasonable" the withholding of their requested administrative action is a commendable example of common sense on the part of the responsible municipal officials.