**MONUMENTAL HEALTH PLAN, INC., Plaintiff,**

v.

**DEPARTMENT OF HEALTH AND HUMAN SERVICES, etc. et al., Defendants.**

Civ. A. No. J-81-387.

United States District Court, D. Maryland.

March 30, 1981.

David R. Cohan and Charles J. Piven, Baltimore, Md., for plaintiff.

Russell T. Baker, Jr., U. S. Atty., Andre Davis, Asst. U. S. Atty., Baltimore, Md., and David E. Benor and Peter A. Pavarini, Rockville, Md., for defendants.

## MEMORANDUM AND ORDER

SHIRLEY B. JONES, District Judge.

Plaintiff Monumental Health Plan, Inc. is a health maintenance organization (H.M.O.) which has been qualified by the Department of Health and Human Services under the Public Health Service Act, 42 U.S.C. § 300e *et seq.* On February 26, 1981 this Court entered a temporary restraining order which enjoined defendants from revoking Monumental's federal qualification. That TRO has subsequently expired. The case originally came before the Court on a motion for preliminary injunction but pursuant to F.R.Civ.P. 65(a)(2) has been consolidated with a hearing on the merits.

### Findings of Fact

In April of 1977, Monumental applied to the Secretary of the Department of Health and Human Services (the Secretary) and more specifically, the Office of Health Maintenance Organizations (O.H.M.O.) to obtain federal qualification as an H.M.O. In October of 1977, Monumental applied for an Operating Cost Loan from the Department of Health and Human Services for 2.5 million dollars. In November of 1979, Monumental received federal qualification as an H.M.O. and was granted the Operating Cost Loan. Monumental received the first installment of the loan of 1 million dollars at

that time. Another installment of 1 million dollars was due to be received in early December of 1980.

In July of 1980, O.H.M.O. became concerned that Monumental was experiencing serious financial problems. An informal evaluation of Monumental was ordered by O.H.M.O. and was performed by Touche Ross & Co. The Touche Ross report revealed that Monumental was indeed having financial problems. The report criticized the manner in which Monumental was organized and was being run. Pursuant to this report, O.H.M.O. in August of 1980 initiated a formal evaluation, and by letter dated August 20, 1980, Monumental was specifically advised of the areas of concern. The evaluation team was made up of outside consultants as well as members of O.H.M.O. The evaluation resulted in a number of reports on all aspects of Monumental's operations. The reports were generally complimentary on the quality of health services which Monumental provided. However, this evaluation also revealed that Monumental was having serious administrative and financial problems. At the conclusion of the site visit, an exit conference was conducted at which it is alleged that Sharley Chen, O.H.M.O. compliance officer, stated that the evaluation would not affect Monumental's receipt of the second installment on the loan.

On November 30, 1980 Monumental's state license to operate as an H.M.O. in Maryland expired and was not renewed by the Maryland State Insurance Commissioner.

On December 3, 1980, Monumental was informed by letter that O.H.M.O. had determined that it was out of compliance with federal requirements. Specifically, Monumental was informed that it had failed to maintain a fiscally sound operation, that it had failed to maintain satisfactory administrative and managerial arrangements, and that it had failed to submit reports as required by the National Data Reporting Act. Specific details were provided as to how Monumental was out of compliance and it was given 30 days to submit a proposed Corrective Action Plan (C.A.P.).

On December 8, 1980 Monumental was informed by a letter from Theodore Weinberg, Director, Division of Compliance O.H.M.O. that it was deemed to be in default on its loan by virtue of its failure to pay a late charge on an overdue interest payment. The letter stated that this would prevent the payment of the second installment of the loan of one million dollars. On December 19, 1980, Howard Veit, Director of O.H.M.O. informed Monumental by letter that it was additionally in default on its loan by virtue of the fact that it had been out of compliance with federal regulations for more than 15 days. Testimony showed that the withholding of the second loan installment was a suspension action which could be lifted in the event that Monumental was brought back into compliance.

Monumental's proposed C.A.P. was submitted to O.H.M.O. on January 5, 1981. On January 6, 1981, O.H.M.O. Deputy Director John O'Rourke and Theodore Weinberg met with representatives of Baltimore area hospitals which were creditors of Monumental and were owed substantial sums. This was done in order to keep the hospitals informed as to Monumental's financial condition. On that same day, Christine C. Boesz, Deputy Director of the Division of Compliance, and Compliance Officer Sharley Chen met with officials of the Maryland State Insurance Commission. There was some controversy as to whether the representatives of O.H.M.O. stated that the decision not to make the second installment of the loan was final. The Court finds that this statement was not made. On January 5, John O'Rourke talked with Joe Calderone, a reporter for the Baltimore News American. The interview resulted in an article published on January 6, 1981 which quoted O'Rourke as stating that the government was going to put Monumental out of business.

On January 16, 1981, Monumental was informed by letter that O.H.M.O. had declared a third event of default as to its loan, as a number of required financial reports had not been submitted.

By letter of January 19, 1981, Veit informed Monumental that its proposed C.A.P. was unacceptable. Monumental was directed to take certain corrective actions, including submitting a revised financial plan and obtaining sufficient private financing to cover operating deficits over and above that provided by the federal loan. These actions were directed to be taken within 30 days of the date of the letter. By letter of January 23, 1981, Veit supplemented the corrective actions which had been directed, including providing additional information and making certain administrative changes. The letter specifically warned that failure to take the directed corrective actions could result in the revocation of Monumental's federal qualification.

On February 19, 1981, Monumental submitted a revised financial plan, enrollment projections, reduced operating expenses, and evidence of financing as directed by O.H.M.O. The evidence of financing consisted of a letter from a Dr. Saul Kay of International Diversifications Financing Associates of Atlanta, Georgia to the effect that 1.3 million dollars in funds was being processed by it for the benefit of Monumental.

Upon examination by O.H.M.O., Monumental's revised financial plan was deemed to be insufficient. Although examination of the plan was done in a brief time, it was sufficient to clearly reveal that the figures of the revised financial plan were inconsistent with other figures that had previously been submitted by Monumental, as well as the fact that certain underlying assumptions of the plan were insufficiently supported by facts. For example, a projected 26% increase in medicaid payments was not supported by documentation. Also, the letter from International Diversifications Financing Associates was deemed to be an insufficient commitment of funds. Sharley Chen attempted to contact International Diversifications in order to clarify the terms of the loan agreement. She spoke to someone who identified himself as International's attorney in Atlanta, but he did not know any of the details of the loan, and directed her to contact Funding International of Timonium, Maryland, through whom the arrangements had been made. She was unable to contact Funding International. On February 25, 1981 she contacted Retailers Commercial Agency of McLean, Virginia and requested a credit check on International Diversifications. The existence of International could not be confirmed.

On February 20, 1981, Monumental was informed by letter that its federal qualification was being revoked effective five working days from the date of the letter. This action was subsequently filed.

The relief which Monumental seeks is essentially two-fold. First, Monumental seeks to enjoin the revocation of its federal qualification. Second, Monumental seeks to require the government to pay the second installment of the loan of 1 million dollars. Monumental's attack on the decision of the Secretary to revoke its qualification and suspend its loan is two-pronged. First, Monumental challenges the Secretary's decision procedurally, in that it was not in accordance with the Administrative Procedure Act, and was a denial of due process. Second, Monumental challenges the decision substantively as being arbitrary, capricious and an abuse of discretion.

## Procedural Issues

The Court will deal first with Monumental's procedural arguments. The first point raised is that the actions of the Secretary were not in accordance with the Administrative Procedure Act, 5 U.S.C. § 554. The fallacy which runs throughout Monumental's arguments relating to the A.P.A. is the assumption that it is applicable to the instant case. The Act simply provides procedures to be followed when a hearing is required by some statute or regulation. "The Act does not create a right to a hearing where none otherwise exists." *State of Colorado v. Veterans Administration*, 602 F.2d 926, 928 (10th Cir. 1979); *Robertson v. Federal Trade Commission*, 415 F.2d 49 (4th Cir. 1969). An examination of the relevant statutory provisions

and regulations discloses that no right to a hearing is provided for in any step in the procedure which was followed by the Secretary. In the absence of any provision for a hearing, the A.P.A. procedures relating to a hearing are inapplicable. Therefore, these arguments are without merit.

■ Monumental also contends that due process required the Secretary to hold a hearing even though one was not provided for. "Procedural due process imposes constraints on governmental decisions which deprive individuals of liberty or property interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1976). In this case, the Secretary's actions affected two related interests of Monumental, its federal certification and its ability to receive the second installment of the government loan. The Court has no problem finding that a property interest was implicated in these actions. Certainly, Monumental did have an expectation of a second installment on the government loan. Also, the revocation of Monumental's federal qualification was a sufficient property interest to require the according of due process. *See 'Hathaway v. Mathews*, 546 F.2d 227 (7th Cir. 1976).

Having concluded that Monumental had a sufficient property interest to require due process does not, however, end the necessary inquiry. Due process is not a fixed concept, but rather "is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). Having determined that due process applies, the Court must now determine what process is due.

■ The major thrust of Monumental's due process hearing argument is that it should have been granted an oral hearing before the agency took action on its qualification or its loan installment. The Court finds this argument to be unpersuasive. Simply because a party was not afforded an oral hearing does not necessarily mean he

has been denied due process. The Supreme Court has outlined three factors to be considered in deciding what process is due.

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. at 335, 96 S.Ct. 903. It is clear that Monumental's interest in the Secretary's actions goes to the heart of its ability to remain in business. It cannot continue as a viable entity without the infusion of federal funds from the loan. The government, however, also has a strong interest in closely regulating Monumental's condition. A substantial sum of the taxpayer's money had already been infused into Monumental and another million dollars was poised to be transferred. The government also had an interest in protecting Monumental's members both in terms of the care provided and the financial ability to provide that care. The government also had an interest in protecting Monumental's creditors from insolvency on the part of Monumental. The risk of an erroneous deprivation is the factor which the Court views as most dispositive in this case. The risk of an erroneous deprivation of Monumental's interest was minimal in light of the procedures followed. Monumental was given adequate notice of the financial deficiencies upon which the Secretary based revocation of Monumental's federal qualification. Monumental was also given ample opportunity to respond to this notice of deficiency and to rectify the problems. "An agency may not validly take action against an individual without a hearing unless its notice to the individual of the adverse action proposed to be taken against him specifies the nature of the facts and evidence on which the agency proposes to take action. Such notice enables the affected party to prepare an informed response

which places all of the relevant data before the agency." *Hess & Clark, Division of Rhodia, Inc. v. Food and Drug Administration*, 495 F.2d 975 (D.C.Cir.1974); *Intercontinental Industries, Inc. v. American Stock Exchange*, 452 F.2d 935 (5th Cir. 1971). It is also important to note that at no time did Monumental dispute the facts upon which the Secretary's action was based. The only thing which Monumental disputes is the conclusions to be drawn from those facts. An agency will not be required to hold a hearing when it would serve absolutely no purpose. *Independent Bankers Association of Georgia v. Board of Governors of the Federal Reserve System*, 516 F.2d 1206 (D.C.Cir.1975). Accordingly, the Court finds that due process was satisfied by the procedures followed by the Secretary in this case.

Monumental's final attack on the procedural aspect of the Secretary's decision is that it was denied due process by virtue of bias on the part of the decision makers. The procedural claim of bias goes to the fact that those who made the decisions affecting Monumental were also involved in the investigations. It is contended, therefore, that the combination of investigatory and adjudicative functions impermissibly taints the decision maker. For reasons previously stated, the Court rejects those arguments based upon provisions of the Administrative Procedure Act. As for those arguments made under the due process clause, the Court finds them to be without merit. It is well established that the mixing of judicial and investigative functions is not in and of itself a violation of due process. *United States v. Litton Industries*, 462 F.2d 14 (9th Cir. 1972); *Intercontinental Industries v. American Stock Exchange*, 452 F.2d 935 (5th Cir. 1971). Only where a combination of these functions results in an intolerably high risk of unfairness is there a denial of due process. After consideration of all the evidence in this case, the Court finds that the combination of functions in the present case did not present an intolerably high risk of unfairness on the part of the Secretary. *Withrow v. Larkin*, 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975). Therefore, Monumental's arguments going to the procedural aspects of the Secretary's decision cannot be sustained.

### Substantive Issues

Having concluded that the procedure through which the Secretary reached his decision was permissible, the Court must now examine the substantive merits of that decision itself. Initially, the Court notes that no decisions have been found which have reviewed the actions of the Secretary relating to qualifications of an H.M.O. The Secretary, however, does not dispute the reviewability of this decision and, accordingly, the Court assumes that it has jurisdiction to do so. The scope of review in a case such as this is a narrow one. Initially, the Court must determine whether or not the necessary procedural requirements were complied with. Finally, the Court must examine the Secretary's decision to see whether it was reached arbitrarily or capriciously, was an abuse of discretion or otherwise not in accordance with law. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

There is no claim by Monumental that the Secretary was acting outside his authority. An examination of the relevant statutes and regulations reveals that the Secretary was acting within his authority. 42 U.S.C. § 300e–9(d).

Second, plaintiff makes no claim that the Secretary did not comply with the requisite procedures. Pursuant to 42 U.S.C. § 300e–11(b)(1) and 42 CFR § 110.904(c)(2), the Secretary upon determining that an H.M.O. is out of compliance, is obligated to inform the organization in writing that it has been determined to be out of compliance and specify in what respect it is out of compliance, as well as directing it to take specific steps to bring it back into compliance. The organization is given 30 days to take the corrective steps. The evidence shows unequivocally that these procedural steps were complied with. Indeed, Monumental had notice of their precarious financial situation months before any definitive action

**250**

was taken by the Secretary. The evidence shows that Monumental became aware of the Secretary's concern at the very latest in August of 1980, when the formal assessment of Monumental was ordered. Pursuant to 42 CFR § 110.904(d), the Secretary may revoke the qualification of an H.M.O. if the ordered corrective actions are not carried out. The Secretary's revocation of Monumental's qualification was done pursuant to this regulation. As to suspension of the loan payments, the Secretary's action was taken pursuant to a contractual provision of the loan agreement which provides:

C. *Refusal of Advances*

In addition to, but not by limitation of other actions which the Secretary may have the right to take, including, but not limited to, declaring the whole of the Loan due and payable the Secretary may, in the event of any default, order that disbursement of the proceeds of the Loan be forthwith suspended. Notice of such suspension shall be delivered to the Escrow Agent by the Secretary in accordance with the terms of the Escrow Agreement, with or without prior notice to Borrower, and remission of such suspension shall be at the sole discretion of the Secretary.

Assuming, *arguendo*, that the Secretary was correct in finding Monumental to be in default, he had the contractual right to suspend payment of the loan installment. Clearly, the evidence shows that the Secretary complied with all necessary procedures.

■ Finally, the court must consider whether or not the Secretary's decision was arbitrary, capricious or an abuse of discretion. The Court is mindful, however, that it is not to substitute its judgment for that of the agency. *Citizens to Preserve Overton Park v. Volpe, supra.* This is especially true where the agency's judgment involves a considerable amount of expertise in economic projection and cost analysis. *Local 2855, AFGE AFL-CIO v. United States*, 602 F.2d 574 (3rd Cir. 1979). In deciding whether or not the Secretary's decision was arbitrary, capricious or an abuse of discretion, the Court must ensure "both that the

[Secretary] has adequately considered all relevant factors and that it has demonstrated a rational connection between the facts found and the choice made." *U. S. Lines v. Federal Maritime Commission*, 584 F.2d 519, 526 (D.C.Cir.1978).

■ Monumental argues vigorously that the Secretary's decision was arbitrary and capricious by virtue of actual bias of the part of the decision makers. Monumental supports this argument with the fact that in September of 1980, an internal letter written by John O'Rourke, Deputy Director of O.H.M.O., was leaked to the press. Monumental also points to an interview which was given by O'Rourke to the press in early January to the effect that the decision had been made to put Monumental out of business. There is some dispute as to whether O.H.M.O. was responsible for releasing the letter in September of 1980, or whether the statements quoted in the press by O'Rourke were accurate. Even resolving all these issues in favor of Monumental, the Court is not persuaded that these acts show bias on the part of O.H.M.O. so as to render the Secretary's decision arbitrary and capricious. Although these actions on the part of O.H.M.O. were indiscreet and ill advised, they did not sufficiently taint the decision making process in this case so as to invalidate the decision which was based on the facts. *See Las Vegas Valley Broadcasting Co. v. Federal Communications Commission*, 589 F.2d 594 (D.C.Cir.1978); *Belsinger v. District of Columbia*, 295 F.Supp. 159 (D.D.C.1969), *rev'd on other grounds*, 436 F.2d 214 (D.C.Cir.1970).

■ When the Secretary's decision is viewed in light of the facts which were before the agency, the Court is unable to conclude that this decision was arbitrary, capricious or an abuse of discretion. It is important to note that the information upon which the Secretary's decision was based has not been disputed by Monumental. All the evidence in this case points to the fact that Monumental's financial condition was serious, if not terminal. Monumental's major contention is that had the Secretary released the one million dollar

installment, its financial condition would have been acceptable. The evidence simply does not bear this out. It was the testimony of Maryland Insurance Commissioner Edward J. Birrane, which the Court finds to be highly credible, that as of January 19, 1981, Monumental had a deficit of approximately $2,760,000. It was his testimony that even with the federal loan installment, Monumental would still have remained in severe financial straits. He specifically noted that Monumental's own figures as of December 31, 1980 showed that it was continuing to lose money and that it was too far behind to catch up. Howard R. Veit, Director of O.H.M.O., testified that the federal loan would not have been sufficient in and of itself to rectify Monumental's financial difficulties. He estimated that an infusion of between $500,000 and $1,000,000 of private capital would have been necessary to bring Monumental into compliance. The lack of private financing was deemed to be one of the failures in the Corrective Action Plan submitted on January 5, 1981. By letter dated January 19, 1981, Veit informed Monumental that one of the corrective steps it would be required to take would be to obtain financing sufficient to cover deficits over and above those covered by the federal loan. It is undisputed that Monumental has failed to obtain any private financing whatsoever. Monumental complains that the review to which the revised C.A.P. was subject on February 19, 1981 was cursory. Although Sharley Chen testified that she examined the revised C.A.P. for a little over an hour, the major thrust of her examination was to find evidence of sufficient financing to keep Monumental solvent. Certainly the letter provided from International Diversifications Financing Associates was in and of itself insufficient evidence of a commitment of financing and the subsequent inquiries made by Chen were to no avail. The Court also finds the testimony of Theodore J. Weinberg, Director of the Office of Compliance at O.H.M.O. to be highly credible. It was his testimony that Monumental's financial condition was such that it could not remain viable without a substantial infusion of private funds. It was he who originally made the recommendation that Monumental be required to obtain private financing. He cast a good deal of doubt on the validity of the C.A.P., especially citing the fact that in the past Monumental's actual losses had greatly exceeded its projected losses. He also raised valid questions as to the bases for assumptions underlying the C.A.P. projections. Indeed, when the final revocation came on February 20, 1981, Monumental's own figures showed that for January, 1981 its actual loss was $115,800, as opposed to the projected loss of $63,613 in the February 19, 1981 revised C.A.P. The validity of the projected July 1981 break even point was tenuous at best, and in any event did not answer the underlying problem of Monumental's inability to pay the accumulated and steadily rising deficit.

A number of less important facts also support the decision of the Secretary. Monumental had on several occasions failed to file reports as required by the National Data Reporting Act. Monumental had also been unsuccessful in implementing certain changes in management which had been required by the Secretary. Putting it all together, Monumental simply was not in compliance with 42 C.F.R. § 110.108(a)(1)(i) which requires that H.M.O.'s maintain a fiscally sound operation. The Secretary's decision was amply supported by the record and, accordingly, the Court finds that it was not arbitrary, capricious or an abuse of discretion.

The Court wishes to note, however, that the evidence shows positive aspects of Monumental's plan which are commendable. Clearly, this was an organization which was providing high quality health care and was staffed by a group of people who were dedicated to making the plan work. Unfortunately, an organization cannot be run on dedication alone, and Monumental's financial situation was beyond any help the Secretary could offer.

Accordingly, Monumental's request for injunctive and declaratory relief is denied, and the Clerk of this Court is directed to enter judgment in favor of defendants.